**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 31 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

THAO DINH LE,

Defendant - Appellant.

No. 98-5088

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CR-97-84-H)**

---

Mark D. Lyons (Kevin Danielson with him on the briefs), Lyons & Clark, Tulsa, Oklahoma, for Appellant.

Neal B. Kirkpatrick, Assistant United States Attorney (Stephen C. Lewis, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Appellee.

---

Before **ANDERSON** , **KELLY** , and **MURPHY** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

On December 12, 1997, after the district court denied his motion to suppress evidence, Thao Dinh Le pled guilty to the following offenses: (1) possessing firearms while being a user of unlawful controlled substances, in violation of 18 U.S.C. § 922(g)(3); (2) possessing unregistered destructive devices, in violation of 26 U.S.C. § 5861(d); and (3) carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  Le now appeals from the district court's denial of his motion to suppress evidence. For the reasons discussed below, we affirm.

**BACKGROUND**

On July 2, 1997, pursuant to a state search warrant issued June 27, 1997 ("the state warrant"), which authorized a search of Le's residence for methamphetamine, officers of the Tulsa Police Department (TPD) entered Le's residence.  Because the state law enforcement officers had some reason to believe that explosives and other weapons might be present at the residence, they had previously notified a TPD K-9 bomb-sniffing squad and agents from the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) that their services might be required at some point during the search.  Upon entering the residence, officers discovered methamphetamine and other controlled substances, as well as a stockpile of explosives and other assorted military-style ordnance, including the

-2-

following: four different varieties of rifle grenades; a Claymore mine; hand grenades; smoke grenades; five different types of machine guns; plastic explosives, TNT, and detonating cord; and a grenade launcher. Upon discovering the explosives, TPD officers called in the K-9 team and the ATF agents. TPD officers did not seize the explosives, but they did seize controlled substances, several firearms, and other assorted items.

Later that day, based on the explosives and weapons that they had seen while at Le's residence with the TPD officers, federal agents obtained a federal search warrant to again enter Le's residence, this time to search for and seize explosives ("the federal residence warrant"). This warrant was executed in the evening hours of July 2, and federal agents seized the explosives and heavy weapons discovered earlier in the day.

At about the same time that the TPD officers were executing the state warrant, a combined force of TPD officers and ATF agents stopped Le as he was driving his truck through Tulsa. The purpose of this stop was to execute a search warrant, issued June 27, 1997, for samples of Le's blood and hair ("the blood and hair warrant"). This warrant contained an unusual provision which ordered Le, if he refused to provide the samples, to appear before the district court to show cause why he had not complied with the warrant. During this stop, Le was arrested and taken into custody, and the samples were taken.

Also during the day on July 2, ATF agents executed another federal warrant, also issued June 27. This warrant ("the first federal business warrant") authorized agents to search Le's business, Cadre Supplies, Inc., for records and documents relating to firearms transactions. During the execution of this warrant, agents seized stacks of documents, including log books, phone message books, and other records. While on the business premises, agents discovered boxes of weapons and weapon parts, and they contacted an agent of the U.S. Department of Defense, who came to the business and examined the weaponry to determine if the items were stolen military equipment. The Defense agent determined that many of the weapons were indeed stolen. However, no weaponry was seized at the business on July 2.

On August 4, 1997, ATF agents executed yet another search warrant for Le's business ("the second federal business warrant"), this one issued on August 4 and authorizing a search for machine guns, silencers, grenade hulls, night vision equipment, and other assorted weaponry seen at the business by the agents who executed the July 2 search. While at the business on August 4, agents seized many such items.

Soon after the initial searches and seizures, a federal grand jury returned a nine-count indictment against Le, based upon the evidence gleaned from the various searches of Le's residence and business. Le was charged with the

following offenses:  (1) possession of a stolen firearm, in violation of 18 U.S.C. § 922(j); (2) unlawful possession of machine guns, in violation of 18 U.S.C. § 922(o); (3) possession of firearms while being a user of unlawful controlled substances, in violation of 18 U.S.C. § 922(g)(3); (4) possession of stolen explosives, in violation of 18 U.S.C. § 842(h); (5) possession of unregistered destructive devices, in violation of 26 U.S.C. § 5861(d); (6)-(8) three counts of carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (9) possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d).

Le then filed a motion to suppress evidence and two supplemental motions to suppress evidence, challenging all five of the warrants issued in this case.  Le challenged the state warrant on four grounds, claiming that (1) insufficient probable cause existed in the warrant's underlying affidavit; (2) under Oklahoma law, which he asserted controlled the question, the search was impermissible because the affidavit did not state the last time that contraband was observed at Le's residence; (3) the warrant itself was not sufficiently particular, because it made no mention of the explosives found in the house and seized; and (4) the officers exceeded the permissible scope of the warrant.

Le challenged the federal residence warrant on the ground that, because it made mention of only one type of explosive device, it was not particular enough,

and on the ground that the officers exceeded the scope of the warrant. Le also challenged the first federal business warrant, arguing that the warrant's affidavit did not convey to the magistrate sufficient probable cause, that the warrant was not sufficiently particular, and that the officers executing the warrant exceeded the warrant's scope. In his motions to suppress, Le also challenged the second federal business warrant, but apparently abandoned this challenge by stipulation with the government. [1]

---

[1]The district court, in its order disposing of Le's motion to suppress, declined to address Le's objections to the second federal business warrant and the federal residence warrant, because "[t]he suppression issues with respect to these search warrants were resolved by stipulation between" the parties. Appellant's App. at 18 n.2. The district court's assertion that these issues were resolved by stipulation is only partially correct. Le's attorney, when asked by the judge to make his argument relating to the second federal business warrant, stated as follows:

> Your Honor, I don't believe there's anything further we need to offer at this point. [The prosecutor] and I have talked, and as there's nothing at this point that was seized during the August 4th search warrant that is the subject of a prosecution at this point, . . . [argument on this issue is] not going to be helpful at this time, so I don't think a stipulation is necessary.

Tr. of Hearing on Motions, October 17, 1997, at 249. The government argues that, by making this statement, Le withdrew his objections to the second federal business warrant, or at least admitted that any objections Le had to that warrant were moot. We agree, and, like the district court, decline to address any objections to this warrant.

However, the district court's statement that Le's objections to the federal residence warrant were also waived is not supported by the record. Indeed, the

(continued...)

Finally, Le challenged the blood and hair warrant on the ground that the executing officers had neglected to inform him of the warrant's unusual provision allowing him an audience before the district court in the event he refused to comply with the warrant.

On December 9, 1997, the district court issued an order disposing of Le's various objections to the search warrants. The district court granted Le's motion to suppress evidence gleaned from the execution of the blood and hair warrant, ruling that Le should have been apprised of his right to appear before the district court. However, the district court denied, either on the merits or as moot due to stipulation, Le's motion as to the other four warrants.

Following the district court's denial of his motions to suppress, Le entered into a plea bargain. The government agreed to dismiss six of the charges, and Le pled guilty to ( 1) possessing firearms while being a user of unlawful controlled substances, in violation of 18 U.S.C. § 922(g)(3); (2) possessing unregistered destructive devices, in violation of 26 U.S.C. § 5861(d); and (3) carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). On the first two counts, Le was sentenced to terms of 70

---

[1](...continued)
government concedes in its brief that "the record is not clear that the government and Le reached a stipulation regarding that warrant." Appellee's Br. at 2. Thus, our discussion below will include analysis of Le's objections to the federal residence warrant.

months' imprisonment, with the terms to run concurrently. On the third count, Le was sentenced to a term of 60 months' imprisonment, with the term to run consecutively to the two concurrent 70-month sentences.

Under the terms of the plea agreement, Le also "agree[d] to forfeit and otherwise waive any ownership right he might possess in all items seized during the investigation of any of the acts alleged" in the indictment, "including acts to which the defendant is not pleading guilty." Appellant's App. at 112. Before sentencing, Le filed a motion requesting that the government return the property seized in the searches. The district court denied this motion by minute order on April 13, 1998.

Le now appeals from the decisions of the district court. First, advancing the same arguments that were denied by the district court, Le appeals from that portion of the district court's December 9, 1997, order which denied his motion to suppress. Le also appeals from the district court's April 13, 1998, minute order which denied his motion for return of seized property.

## DISCUSSION

### I. The Search Warrants

We first address Le's objections to the search warrants. "When reviewing a district court's denial of a motion to suppress, we accept its factual findings

unless clearly erroneous and view the evidence in the light most favorable to the government." United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997), cert. denied, 118 S. Ct. 1526 (1998). It is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference. Id. However, "[t]he ultimate determination of reasonableness under the Fourth Amendment . . . is a question of law which we review de novo, considering the totality of the circumstances." Id.

### A. The State Warrant

Le raises several issues with respect to the state warrant. First, he claims that it violated state standards governing admissibility, and that therefore the evidence yielded therefrom should be inadmissible. Second, he argues that sufficient probable cause was not set forth in the affidavit to satisfy either federal or state standards. Third, he argues that the warrant lacked particularity because it failed to mention the explosives that TPD officers had reason to believe were present at the residence. Finally, he argues that the executing officers exceeded the scope of the warrant. We address each of these arguments in turn.

### 1. The Legal Standard

As an initial matter, Le argues that state law standards, rather than federal constitutional standards, should govern the admissibility of evidence seized pursuant to the state warrant, even though his case is a federal prosecution. Often, this question is merely academic due to the fact that many state statutes and constitutional provisions are interpreted co-extensively with their federal counterparts. See, e.g., People v. Luttenberger, 784 P.2d 633, 639 (Cal. 1990) (stating that California "appl[ies] federal standards to decide whether relevant evidence seized pursuant to a search warrant must be excluded"). However, in some instances states have chosen to interpret their own constitutional guarantees more strictly than similar federal constitutional provisions. Oklahoma, for instance, has state law requirements that are, in one aspect relevant to this case, more exacting than federal standards.

Oklahoma courts require that search warrant affidavits state clearly the specific dates on which contraband or evidence of a crime was observed on the premises to be searched. Morris v. State, 617 P.2d 252, 252 (Okla. Crim. App. 1980) (stating that "[w]hen officers seek a search warrant based on information from a confidential informant, it is required that they be able to say _when_ the informant obtained his information"). Federal courts, by contrast, which apply a

"totality-of-the-circumstances analysis," do not specifically require such

information. Illinois v. Gates, 462 U.S. 213, 238-39 (1983).

It is, however, well established in this circuit that "in federal prosecutions

the test of reasonableness in relation to the Fourth Amendment protected rights

must be determined by Federal law even though the police actions are those of

state police officers." [2] United States v. Miller, 452 F.2d 731, 733 (10th Cir.

1971). We have reaffirmed this principle many times since Miller. See, e.g.,

United States v. Callwood, 66 F.3d 1110, 1112 n.1 (10th Cir. 1995); United States

v. Morehead, 959 F.2d 1489, 1497 (10th Cir. 1992); see also United States v.

Miles, 772 F.2d 613, 615-16 (10th Cir. 1985) (upholding the validity of an

Oklahoma state search warrant, using the federal totality of the circumstances

test, even though "[t]he affidavit did not state on what date the informant claimed

---

[2]Nearly every circuit to address the issue is in accord. See United States v. Bell, 54 F.3d 502, 503-04 (8th Cir. 1995); United States v. Clyburn, 24 F.3d 613, 616 (4th Cir. 1994); United States v. Wright, 16 F.3d 1429, 1433-37 (6th Cir. 1994); United States v. Walker, 960 F.2d 409, 415-16 (5th Cir. 1992); United States v. Mealy, 851 F.2d 890, 907 (7th Cir. 1988); United States v. Pforzheimer, 826 F.2d 200, 202-04 (2d Cir. 1987). But see United States v. Mota, 982 F.2d 1384, 1387-88 (9th Cir. 1993). One commentator has stated that the argument that state law should provide the standards for admissibility of evidence in federal prosecutions "has not prevailed," and that "if either federal or state officers conduct a search which is illegal under the law of the state where undertaken, the fruits thereof are not constitutionally barred from evidence in federal courts." 1 Wayne R. LaFave, Search and Seizure § 1.5(c), at 146-47 (3d ed. 1996) (citing cases). For a discussion of this issue's contorted judicial history, see Kenneth J. Melilli, Exclusion of Evidence in Federal Prosecutions on the Basis of State Law, 22 Ga. L. Rev. 667 (1988).

to have seen the transaction with the stolen guns in the appellant's home"). The basis for this principle is that "the exclusionary rule is only concerned with deterring [federal] Constitutional violations." United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994). Therefore, "[t]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." Id. Le's argument for the applicability of state law standards simply cannot withstand scrutiny.

Thus, the district court was correct to apply federal constitutional principles to the issue at hand. The specific requirements of Oklahoma law, such as the requirement that the affidavit state the specific dates on which criminal activity was observed on the premises to be searched, are only parts of the totality of the circumstances which federal courts must consider in determining whether the affidavits underlying state search warrants are sufficient. See United States v. Richardson, 86 F.3d 1537, 1544 (10th Cir. 1996) (stating that federal courts are to "conduct an independent inquiry . . . apply[ing] federal law" into the reasonableness of a search, but that federal courts "are not prohibited from considering state law, although such consideration may not enlarge nor diminish federal law" (citation omitted)).

## 2. Sufficiency of the Affidavit

When reviewing a magistrate's finding of probable cause for the issuance of a search warrant, we "must consider the totality of the circumstances and determine whether the affidavit established the probability that evidence of criminal activity would be located in the desired search area." United States v. Wittgenstein, 163 F.3d 1164, 1171 (10th Cir. 1998). A magistrate's determination that probable cause exists is entitled to "great deference," and "we ask only whether the issuing magistrate had a 'substantial basis' for determining probable cause existed." Id. at 1172 (quoting Lawmaster v. Ward, 125 F.3d 1341, 1348 (10th Cir. 1997)); see Gates, 462 U.S. at 238-39. Applying this standard, we conclude that the magistrate's decision was proper.

The affidavit presented to the state magistrate in this case contained the following information. The affiant, TPD Officer James Comstock, stated that he had received information from two different confidential informants, both of whom provided essentially the same information. The first informant stated that Le was selling several varieties of drugs from his residence, and that "he had seen a considerable amount of [methamphetamine, cocaine, and marijuana] at [Le's] residence on numerous occasions, and had bought cocaine and methamphetamine from [Le], over one-hundred, (100), times in the past couple of years." Appellant's App. at 41. This source also stated that Le "has a gun store" which

-13-

"sells fully automatic fire arms" and that Le "keeps some of these weapons and ammunition at his residence." Id. The source stated that, because of Le's access to weapons, he "was scared of any repercussions that might occur should [he] assist officers in any other way." Id. at 41-42.

The second source corroborated the first, stating that "he has worked for [Le] in the past, and has bought methamphetamine and cocaine from [Le] on numerous occasions from both [Le's] residence and from [Le's] gun shop," and that "he has seen [Le] to have in his possession . . . a kilogram of cocaine." Id. at 42. This source also stated that he was "scared of [Le] because of his access to automatic weapons." Id.

In an effort to corroborate the information received from the two confidential sources, Comstock ascertained that Le did indeed live at the address given by both sources; that Le did indeed have a gun shop at the address given by both sources; and that the gun shop was licensed by the federal government to sell firearms, including machine guns and silencers. [3] In addition, on June 13, 1997,

_____

[3]Le makes much of the fact that Comstock, in the affidavit, states that "Le owns Cadre Arms" and "Le has a Class III federal firearms license and can sell automatic weapons." Appellant's App. at 42. He argues that he does not actually own the gun shop, Cadre Supplies, Inc., and notes that Cadre Supplies, Inc., rather than Le in his individual capacity, is the actual federal firearms licensee. In his brief, Le asserts that because some of the corroborating facts are "false," the affidavit must be devoid of probable cause. Appellant's Br. at 37. We think Le overstates the inaccuracies in the affidavit. While Le may not have "owned"

(continued...)

Comstock collected the trash that Le left at his curb, and discovered a "used ziploc baggie with a white powder residue inside of it."    Id.  A field test revealed that the white powder in the baggie was methamphetamine.    Id.  On June 27, 1997, Comstock again collected Le's trash, and found two small baggies, similar to the one found on June 13, but these two baggies had been washed clean.    Id.

We think that the information in the affidavit, taken as a whole, supports the magistrate's finding that probable cause existed to issue the warrant.  The affidavit contained information provided by two different informants whose stories were remarkably consistent.  "[C]onsistency between the reports of two independent informants helps to validate both accounts."    United States v. Schaefer , 87 F.3d 562, 566 (1st Cir. 1996);    see also  United States v. Fulgham  , 143 F.3d 399, 401 (8th Cir. 1998) (holding that the magistrate's finding of probable cause was supported by, among other things, the "reciprocally corroborative" consistency in the information provided by two separate

---

3(...continued)
Cadre Supplies, Inc., he was so essential to the business that soon after Le was incarcerated "[t]he business . . . closed up."  Tr. of Hearing on Motions, October 3, 1997, at 107 (statement of Le's attorney, arguing that Le should be released on bond so that the business could remain solvent).  And while the federal firearms license was not in Le's individual name, it was in the name of a corporation of which he was an essential part.  We are satisfied that any inaccuracies contained in the affidavit's corroborating statements are insubstantial, and that the statements do corroborate the informants' assertions that Le was involved in the purchase and sale of heavy weapons.

informants); United States v. Pritchard, 745 F.2d 1112, 1121 (7th Cir. 1984) (stating that "[b]y telling consistent yet independent stories, the informants provide 'cross-corroboration,' and enhance the reliability of the application as a whole" (citations omitted)). Also, it was against the penal interest of the informants to provide this type of information to the police, a factor we have considered indicative of reliability. See United States v. Sturmoski, 971 F.2d 452, 457 (10th Cir. 1992).

In addition, Officer Comstock corroborated the informants' information, first by ascertaining that Le was involved in a business that bought and sold firearms and thus had access to heavy weapons, and second by searching Le's refuse and discovering traces of methamphetamine on June 13. Le argues that Comstock's discovery of methamphetamine in Le's trash on June 13 is "stale" evidence and too far removed from the July 2 search to be probative of criminal activity at the residence. Appellant's Br. at 39-40. However, "the determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant." United States v. Myers, 106 F.3d 936, 939 (10th Cir.), cert. denied, 117 S. Ct. 2446 (1997). Where the offense in question is "ongoing and continuing[,] . . . the passage of time is not of critical importance." Sturmoski, 971 F.2d at 457.

-16-

In this case, both informants stated that Le's narcotics operation was a continuing and ongoing activity. Both stated that they had purchased drugs from Le "on numerous occasions," Appellant's App. at 41, 42, and the first informant stated that such purchases had been occurring over a two-year period, id. at 41. With regard to an ongoing criminal enterprise such as the one Le was involved in, a search warrant affidavit can contain information that is more than a few days old. Indeed, we have upheld a magistrate's finding of probable cause in cases involving ongoing criminal operations where the gap between the receipt of the probative information and the issuance of the warrant was two-and-one-half weeks, see Miles, 772 F.2d at 616, and even five months, see Myers, 106 F.3d at 939. In this case, we cannot conclude that a lapse of only fourteen days between Comstock's corroboration and the issuance of the warrant, and another lapse of five days between the issuance of the warrant and its execution, renders evidence of Comstock's discovery fatally stale. The issuing magistrate was entitled to consider evidence of Comstock's search of Le's trash.

Looking at the totality of the circumstances presented to the issuing magistrate, we think that probable cause existed for the issuance of the state warrant. The combination of the informants' reciprocal corroboration and Comstock's corroborative efforts "reduced the chances of a reckless or prevaricating tale, [and] thus provid[ed] a substantial basis for crediting" the

-17-

informants' assertions.   Gates, 462 U.S. at 244-45 (citations omitted).  Taken together, all of the facts and corroborative information contained in the affidavit were sufficient to give the magistrate a "substantial basis" upon which to conclude that there was "a fair probability that contraband or evidence of a crime [would] be found" at Le's residence.   Id. at 238.

### 3.    Particularity of the Warrant

The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Le argues that the state warrant failed to meet this requirement because it authorized a search only for "methamphetamine" and "fruits [and] instrumentalities" of methamphetamine transactions.  Appellant's App. at 47.  The warrant made no mention of the explosives, machine guns, and other assorted ordnance that TPD officers suspected might be stored at Le's residence, and which those officers in fact found at the residence.  Le argues that the government's failure to include explosives and related items in the warrant turned the state warrant into an invalid general warrant.

Le grounds his argument in the reasoning of      Coolidge v. New Hampshire   , 403 U.S. 443 (1971).  In that case, a plurality of the Supreme Court set forth the contours of the "plain view" exception to the Fourth Amendment's warrant

requirement. The plurality stated that an officer could seize an item for which he had no warrant when that item is found in plain view and (1) the officers are lawfully in a position to observe the item; (2) the discovery of the item is inadvertent; and (3) it is immediately apparent to the searching officers that the item is evidence of a crime or contraband. Coolidge, 403 U.S. at 468-71 (plurality opinion); Horton v. California, 496 U.S. 128, 142 (1990) (Brennan, J., dissenting). Especially relevant here is the second requirement set forth in Coolidge: the inadvertence requirement. The Coolidge plurality made clear that the Fourth Amendment's warrant requirement dictates that police obtain a warrant for items that they know about and intend to seize: "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized.'" Coolidge, 403 U.S. at 471 (plurality opinion) (citing U.S. Const. amend. IV).

However, because the inadvertence requirement to the plain view exception was announced by only a plurality of the Court, there was some question as to whether the requirement was binding precedent. See Texas v. Brown, 460 U.S. 730, 737 (1983) (plurality opinion) (stating that, even though the inadvertence requirement had generally been applied by lower courts, it "has never been

-19-

expressly adopted by a majority of this Court" and that it was "not a binding precedent"). In 1990, a majority of the Court finally held that inadvertence "is not a necessary condition" of "legitimate 'plain-view' seizures." Horton, 496 U.S. at 130. The Court stated that "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." Id. at 138. [4]

In the case before us, the government concedes that TPD officers had some knowledge of the existence of explosives and heavy weapons at Le's residence prior to executing the state warrant. Tr. of Hearing on Motions, October 17,

---

[4]In support of his contention that the warrant was not sufficiently particular, Le cites three pre- Horton cases. United States v. Sanchez, 509 F.2d 886 (6th Cir. 1975); United States v. Carney, 356 F. Supp. 855 (M.D. Tenn. 1973); United States v. Tranquillo, 330 F. Supp. 871 (M.D. Fla. 1971). Each of these cases is inapposite. First, to the extent that these cases rely on the inadvertence prong of the plain view exception to the warrant requirement, they have been superseded by Horton. In addition, as the government correctly notes, Sanchez and Carney, cases in which federal officers without their own warrants actually accompanied warranted state officers on a search of a suspect's house and conducted their own separate searches of the premises, have been distinguished in a post- Horton Sixth Circuit case on facts very similar to the case at hand . See United States v. Bonds, 12 F.3d 540, 570-72 (6th Cir. 1993) (upholding a search warrant where, as in this case, the federal officers did not actually participate with the state officers in the search, and were only called in after the state officers, conducting a valid search, discovered contraband in plain view). Finally, in Tranquillo, the district court found evidence of bad faith on the part of the government, a finding which was central to its holding. No such evidence is present in this case.

-20-

1997, at 222 (government counsel stating that "Judge, I think I can shorten this by saying we will stipulate that Officer Comstock had knowledge prior to his arresting [Le], that there . . . could be explosives located in the house"). Indeed, Officer Comstock stated that he "had been told" that there were explosives in the house, but that he "did not know [that] for a fact," and that TPD officers did not seek a search warrant for explosives prior to July 2 because, until that date, they had no corroborating information to back up the claims of informants that explosives and weapons were present at Le's residence. Tr. of Hearing on Motions, September 11, 1997, at 65, 69, 79. Comstock also stated that because TPD officers suspected that there might be explosives at the residence, out of an abundance of caution for officer safety they notified a K-9 team from the TPD bomb squad and told them to be on standby. Id. at 47.

Upon entering Le's residence pursuant to the state warrant for drugs, TPD officers discovered drugs, weapons, and explosives. The search warrant return indicates that TPD officers seized several varieties of drugs and weapons, but did not seize the heavy weaponry and explosives. Appellant's App. at 49-51. Later that day, based on what the TPD officers and the federal agents, who had been called in when explosives were discovered, had seen at the residence, a second warrant was issued for Le's residence, authorizing federal agents to search for explosives.

We think the actions of law enforcement officers in waiting to seize the explosives until after the issuance of the second warrant was lawful and even commendable behavior. It likely would have been permissible in this case for the officers to have simply seized the explosives without obtaining the second warrant. Indeed, the Supreme Court has expressly endorsed such actions, stating that "if [an officer] has a valid warrant to search for one item and merely a suspicion concerning the second [item], whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first." Horton, 496 U.S. at 139. Here, however, the officers took the extra precautionary step of waiting to seize the explosives until after the second warrant for explosives had been issued.

In sum, we cannot conclude that the officers' behavior was unlawful. We think it clear that the inadvertence requirement is no longer a necessary condition for a legal "plain view" seizure. Under current Supreme Court precedent, a police officer may, if on the premises pursuant to a valid warrant or under an exception to the warrant requirement, seize items which immediately appear to be evidence or contraband of a crime. Here, law enforcement officials acted with due regard for both officer safety and the Fourth Amendment by calling in the K-9 team and the ATF agents only after explosives were discovered in plain view during a lawful search for drugs, and by waiting to seize those explosives until after a

-22-

second warrant, this one for explosives, had been issued.  In this case, we cannot conclude that the state warrant was infirm merely because it did not specifically authorize a search for explosives.  The explosives were discovered because they were in the plain view of the TPD officers legally on the premises.  Accordingly, the state warrant meets the Fourth Amendment's particularity requirement.

### 4. Scope of the Search

Le next argues that the officers who executed the state warrant grossly exceeded the scope of the warrant by seizing several items not specifically mentioned in the warrant, and that the remedy for this alleged violation of his Fourth Amendment rights should be a blanket suppression of everything seized pursuant to the state warrant.

We begin our analysis by noting that "the general rule," where executing officers exceed the scope of a warrant, "is that 'only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.'"    Hargus , 128 F.3d at 1363 (quoting United States v. $149,442.43 in U.S. Currency     , 965 F.2d 868, 875 (10th Cir. 1992)).  In the vast majority of cases, "a search is not invalidated merely because some things are seized that are not stated in the warrant."        Id.  "This is

-23-

particularly true when the non-specified items are not admitted into evidence against the defendant." Id.

In very rare cases, however, we have applied the unusual remedy of blanket suppression. In United States v. Medlin , 842 F.2d 1194 (10th Cir. 1988), for instance, we ordered a blanket suppression of all items seized pursuant to a federal warrant authorizing a search for "firearms." Id. at 1195. In that case, local officers who did not possess a separate warrant entered the residence with the federal officers, and the local officers seized "667 items of property none of which were identified in the warrant authorizing the search." Id. at 1196. We held that the officers, by seizing so many items not mentioned in the warrant, exhibited a "flagrant disregard" for the terms of the warrant and actually "transformed" the otherwise valid warrant "into a general warrant." Id. at 1199. In such cases, we stated, blanket suppression is appropriate. Id.

Similarly, in United States v. Foster , 100 F.3d 846 (10th Cir. 1996), we held that blanket suppression was again the proper remedy, where state officers acting pursuant to an otherwise valid warrant seized over 60 items not mentioned in the warrant, including VCR machines and video equipment, a socket set, a pair of green coveralls, a riding lawn mower, three garden tillers, several stereo systems, two microphones, several televisions, a drill, a camera tripod, a BB gun, a camera, a metal rod, a clock radio, and a screwdriver set. Id. at 848 n.1. One of

-24-

the executing officers in that case even testified at the suppression hearing that the officers had simply taken anything of value in the house, and that this was the usual method employed by police in this particular county. Id. at 850-51 nn.5-6. Citing Medlin , we held that these officers had also exhibited a flagrant disregard for the terms of the warrant, and we suppressed everything seized pursuant to the warrant.

The only other federal appellate case of which we are aware in which blanket suppression was the remedy applied is United States v. Rettig , 589 F.2d 418 (9th Cir. 1978). In that case, after obtaining the search warrant through less-than-forthright means, executing officers seized "some 2,288 items," including numerous U.S. government publications, credit card applications, bank brochures, medical and dental records, and many other documents. Id. at 421. The Ninth Circuit held that "[a]s interpreted and executed by the agents, this warrant became an instrument for conducting a general search," and suppressed all evidence discovered in the search. Id. at 423.

Keeping in mind the rule that blanket suppression is an extreme remedy, almost wholly absent from the Fourth Amendment jurisprudence of other circuits, we must determine whether the officers executing the state warrant so flagrantly exceeded its scope that blanket suppression is a justifiable remedy. The state

warrant, which we have already determined to be validly issued, authorized a search for the following:

> methamphetamine, fruits, instrumentalities, monies, records, to include telephone number information on possible associates related to the sale of controlled dangerous drugs, financial records, (bank records, checking, savings and business account information), that demonstrate the above subject is deriving profit from the sale of methamphetamine or any other controlled dangerous drugs and dispersement [sic] of assets which are drug related, proof of residency, drug related notations.

Appellant's App. at 47. In connection with the execution of this warrant, TPD officers confiscated some 78 items, including two plastic baggies full of methamphetamine; several pill bottles containing prescription painkillers; several varieties of ammunition; various firearms and gun parts, including a pellet gun; a grenade launcher; a hunting knife; several holsters; one green armor vest; a scanner, monitor, and camera; $710 in U.S. currency; one gold chain; one brown wallet; a bank bag; a night scope; a black address book; a cellular phone; a key chain and assorted keys; and two briefcases containing assorted documents.

Any argument Le might make that the TPD officers exceeded the scope of the warrant by seizing the firearms and ammunition is fatally flawed. The guns and ammunition were discovered pursuant to a valid warrant-based search for methamphetamine, and were in the plain view of the searching officers. Also, Officer Comstock testified that he and the other TPD officers were aware that it was a federal offense for a user of drugs to possess a firearm. See Tr. of Hearing

-26-

on Motions, September 11, 1997, at 56-57; see also 18 U.S.C. § 922(g)(3); United States v. Smith, 899 F.2d 116 (1st Cir. 1990) (Breyer, C.J.) (upholding a plain view seizure of guns by state officers because the state officers were aware that the possession of the guns by the defendant was a violation of federal law). Thus, the guns and the ammunition were properly seized, because they were in plain view of officers legally at the residence, and it was immediately apparent to the officers that the firearms were evidence of a crime. Horton, 496 U.S. at 136-37.

Le argues, however, that the seizure of the pellet gun, the gun parts, the pill bottles, the gold chain, the holsters, and several other items shows that the TPD officers flagrantly disregarded the scope of the warrant. While some of these items may arguably have been improperly seized, the officers did not exhibit a "flagrant disregard" for the terms of the warrant. Medlin, 842 F.2d at 1199. The remedy for any improper seizure here would be suppression of the items improperly seized, not blanket suppression of all items seized, including those lawfully taken.

We need not remand for a specific determination of which items were lawfully seized, because we have determined that the methamphetamine and firearms, the only items taken as a result of the execution of the state warrant for which Le was prosecuted, were lawfully seized.

-27-

**B.    The Federal Residence Warrant**

Le also challenges the federal warrant issued later in the afternoon of July 2, based on what TPD officers, the K-9 team, and the ATF agents had seen at the residence earlier that day, authorizing federal agents to search the house for explosives. Le argues that this warrant was not sufficiently particular, in light of the fact that its underlying affidavit specifically mentioned only one type of explosive device, and that the warrant itself did not specifically refer to any particular types of explosive devices; Le also argues that the executing officers exceeded the scope of the warrant.

**1.    Particularity of the Warrant**

When federal agents went to a U.S. Magistrate Judge on the afternoon of July 2 to request a federal search warrant for Le's residence, they were already aware of some of the specific types of explosives stockpiled in Le's garage. Indeed, at least one ATF agent had personally viewed the explosives and heavy weaponry when he was called in, for officer safety reasons, during the TPD search for drugs. Still, the affidavit submitted to the magistrate judge specifically mentioned only one type of explosive device discovered in the residence—HE M383 explosive grenades. Appellant's App. at 66. The warrant signed by the magistrate judge authorized a search for

[a]ny explosives, explosive materials and parts that can be readily converted into destructive devices, any combination of parts either designed or intended for use in converting any device into a destructive device capable of expelling a projectile by the action of an explosive or other propellant, any and all firing mechanisms to include grenade launchers, launchers and/or any device designed for use as a weapon, as a signaling pyrotechnic, lin throwing, safety, or similar device.

Appellant's App. at 71. Le argues that because the federal agents had more specific information at the time they asked the magistrate judge for a warrant, the warrant should have been more specific.

In general, a warrant meets the Fourth Amendment's particularity requirement "when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Harris, 903 F.2d 770, 775 (10th Cir. 1990) (citations omitted). Consistent with this standard, we have sustained warrants phrased in "[b]road and generic terms of description" in certain cases, for instance in searches for drugs and related paraphernalia, because the nature and characteristics of some criminal operations do not easily lend themselves to specific descriptions of things to be seized. Richardson, 86 F.3d at 1544; see also United States v. Janus Indus., 48 F.3d 1548, 1554 (10th Cir. 1995); Harris, 903 F.2d at 775. This is because even warrants phrased in generic terms can, under some circumstances, still "'allow the executing officers to distinguish between items that may and may not be seized.'" United States v. Finnigin, 113 F.3d

1182, 1187 (10th Cir. 1997) (quoting United States v. Leary, 846 F.2d 592, 602 (10th Cir. 1988)).

We have previously sustained a generically phrased warrant in an explosives case. See Finnigin, 113 F.3d at 1187; see also United States v. Faul, 748 F.2d 1204, 1219 (8th Cir. 1984) (sustaining a search warrant in an explosives case where the warrant authorized a search for "any and all firearms, ammunition, grenades, crossbows, rocket launchers, and other explosive devices"). In Finnigin, on facts similar to the case before us here, where the officers had some specific knowledge of the type of explosive devices thought to be on the premises, we stated that a warrant authorizing a search for "[a]ny and all unlawful explosives, components or materials thereof" was "sufficiently particular to properly 'allow the executing officers to distinguish between items that may and may not be seized.'" Finnigin, 113 F.3d at 1187 (quoting Leary, 846 F.2d at 602).

The warrant issued in this case, worded almost identically to the warrant condoned in Finnigin, authorizing a search for "any explosives, explosive materials and parts," is therefore sufficiently particular to allow the searching officers to distinguish between items that may or may not be seized, even though the officers may have had more specific information regarding the type of some of

the explosive devices.   The federal residence warrant does not violate the Fourth Amendment's particularity requirement.   [5]

## 2.   Scope of the Search

Next, Le argues that the federal agents who executed the federal residence warrant so grossly exceeded the scope of the warrant as to manifest a flagrant disregard for the warrant's terms, thus converting the warrant into an unlawful general warrant.  Le argues, therefore, that all evidence discovered pursuant to this warrant should be suppressed, citing    Medlin  and  Foster .

The search was clearly not the type of search condemned in        Medlin  and Foster .  During the course of the search, federal agents confiscated approximately 50 items, only eight of which can, even under an interpretation of fact and law highly favorable to Le, be considered unrelated to explosives.       Those eight items include a furniture receipt, a video receipt, an envelope addressed to Rachell Harper, and several flares.  Appellant's App. at 73-74.  Even assuming, arguendo, that the seizure of those eight items was entirely unlawful, such action does not

[5]This conclusion is reinforced by the plain view exception to the warrant requirement, which would have allowed the TPD officers to seize the explosives when they were executing the state warrant earlier on July 2.  It would be incongruous to hold that items which could properly have been seized earlier in the day are immunized from seizure later in that same day as a result of federal officers taking an extra precautionary step to make sure that their seizure of the items comported with constitutional procedure.

come close to the type of flagrant disregard for the terms of the warrant found in our prior cases. Thus, Le's remedy would be suppression of the wrongfully seized items, not a blanket suppression order.

In any event, Le's argument is moot because Le was never prosecuted for possessing any of the eight items. He was prosecuted for possessing drugs, guns, and explosives, all of which were seized lawfully. Thus, we decline to remand the case to the district court for a meaningless determination of whether the eight items were unlawfully seized.

## C.    The First Federal Business Warrant

Finally, Le challenges the first federal business warrant, issued June 27 and executed July 2, on the grounds that the magistrate did not have probable cause to issue the warrant, [6] that the warrant was insufficiently particular, and that the executing officers exceeded the scope of the warrant.

---

[6]We note that Le's argument that there was insufficient probable cause to issue the first federal business warrant is not well-developed. Le mentions this argument in one of the headings of his brief, but provides no argument or authorities in support of his position. Appellant's Br. at 42. In his reply brief, in response to the government's charge that the argument was abandoned, Le concedes that the body of his brief ignored the issue but nevertheless asserts that the argument is preserved for appellate review, although even in his reply brief Le does little to support his contention. Appellant's Reply Br. at 16. While the argument is scantily supported, we think that because it was presented to the district court in the first instance, see Tr. of Hearing on Motions, October 17, 1997, at 243-44, and was mentioned in Le's brief, we may address it.

## 1. Sufficiency of the Affidavit

The affidavit underlying the first federal business warrant is the same affidavit used to procure the blood and hair warrant and, in many ways, is similar to the affidavit underlying the state warrant. The affidavit contains information obtained by TPD Officer Comstock, and states that Comstock interviewed one Jay Riseling, a former employee of Cadre Supplies, Inc. [7] Riseling informed Comstock that his duties at Cadre Supplies, Inc. included maintenance of the business's firearms transaction records, and that while so employed he had made "numerous false and fictitious entries which were made in order to conceal the identity of the persons supplying and/or receiving the firearms from authorities and/or to avoid having to pay the applicable federal firearms taxes." Appellant's App. at 58. Riseling also asserted that he had seen Le in possession of considerable amounts of methamphetamine, cocaine, and marijuana, and had purchased such drugs from Le "on numerous occasions in the past couple of years." Id. at 57. Riseling told Comstock that Le purchased cocaine in increments of 10 to 30 kilograms, and that Le appeared to be "heavily addicted to

---

[7]From the language employed in the affidavit, it appears that Riseling may be the unnamed second source in the state warrant's affidavit, although, if this is the case, the reasons for including his name in this affidavit while excluding it from the other affidavit are unclear from the record.

prescription pain medication as well as cocaine and methamphetamine, which he usually ingests by injection on a daily basis." Id.

The affidavit also relates Comstock's efforts to corroborate Riseling's account, including Comstock's discovery of methamphetamine residue in Le's trash. According to the affidavit, federal ATF agents also attempted to confirm Riseling's account by searching national ATF licensing records and ascertaining that Le, doing business as Cadre Supplies, Inc., "is a federally licensed firearms dealer, and is additionally, specifically licensed to deal in machine guns and silencers." Id. at 58. The affidavit concluded by stating that federal agents believed, based on the information contained therein, "that evidence of false and/or fictitious entries may be obtained from the required firearms transaction records, tangible or intangible, for Le's business." Id. Based on the affidavit, a U.S. Magistrate Judge issued a warrant authorizing a search for the firearms transaction records of Cadre Supplies, Inc.

We think this affidavit contains sufficient indicia of probable cause to meet the totality of the circumstances test enunciated in Gates. First, many of Riseling's statements, such as his admissions that he purchased drugs from Le and that he intentionally falsified federal firearms records, are against his penal interest, a factor we have considered indicative of reliability. See Sturmoski, 971 F.2d at 457. Second, this affidavit contains more information about the informant

than the state warrant's affidavit does.  Here, the magistrate is told the informant's name and that the informant worked for Le, and is told in detail what kinds of duties the informant performed for Le while in his employ.  This kind of information sets forth the basis for the informant's knowledge, and would have satisfied one of the prongs of the old Aguilar-Spinelli test.  See Aguilar v. Texas, 378 U.S. 108, 114 (1964) (stating that "the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were").  In Gates, the Supreme Court made clear that such "basis of knowledge" information is "highly relevant in determining the value" of an informant's account.  Gates, 462 U.S. at 230.  Finally, officers were able to corroborate significant details contained in Riseling's account.  Comstock discovered drug residue in Le's trash, and federal agents confirmed, through a check of a national database, that Le, doing business as Cadre Supplies, Inc., was a federally licensed firearms dealer who was licensed to deal in machine guns and silencers and therefore had access to heavy weapons.

In sum, the totality of the circumstances contained in this affidavit afforded the magistrate a "substantial basis for concluding that probable cause existed."  Id. at 238-39 (citations and alteration omitted).

## 2.    Particularity of the Warrant

Next, Le argues that the first federal business warrant was not sufficiently particular, because it did not articulate a specific crime and because it used rather general terms to describe the items to be seized. The affidavit did not mention a specific criminal statute that officers suspected had been violated, but it did contain Riseling's assertion that "he made numerous false and fictitious entries which were made in order to conceal the identity of the persons supplying and/or receiving the firearms from authorities and/or to avoid having to pay the applicable federal firearms taxes." Appellant's App. at 58. The accompanying warrant authorized a search for "[a]ny and all tangible or intangible firearms transaction records for Thao Dinh Le doing business as Cadre Supplies, Inc. and/or any and all other tangible or intangible records pertaining to firearms transactions." Id. at 56. Le asserts that this warrant does not give the executing officers a clear enough picture of the crimes under investigation, and authorizes an unduly broad search into his business records.

First, we are satisfied that the warrant and its accompanying affidavit adequately described the criminal activity under investigation. We have sustained a warrant which did not limit the search to any alleged violation of a particular criminal law in a case where the warrant's affidavit contained information indicating that the suspect was engaged in a "marijuana trafficking operation."

-36-

Harris, 903 F.2d at 774-75. This case is similar. Although the warrant itself does not specifically mention a particular criminal activity, the affidavit states that Le may have been engaged in fraudulently altering his business's federal firearms transaction records in an attempt to hide the identity of firearms purchasers from federal authorities and in an attempt to avoid paying federal firearms taxes. This description of suspected criminal activity is specific enough to give the executing officers adequate guidance, when searching the business, to be able to "distinguish between items that may and may not be seized." Leary, 846 F.2d at 602.

Next, we address Le's contention that the first federal business warrant was not particular enough because it used general terms to describe the items to be searched for. It is true that a warrant authorizing seizure of every single business record possessed by a business may be overbroad. See Voss v. Bergsgaard, 774 F.2d 402, 405-06 (10th Cir. 1985). We have even held that a warrant authorizing a search of an export business for all documents relating to "the purchase, sale and illegal exportation of materials in violation of the" federal export laws was overbroad, because in the context of a search of an export business the limitations in the warrant's authorization "provide[d] no limitation at all." Leary, 846 F.2d at 601. However, as discussed above, we have repeatedly stated that even generally phrased warrants are valid when they are phrased "'as specific[ally] as

[the] circumstances and [the] nature of the activity under investigation permit.'" Janus Industries , 48 F.3d at 1554 (citing United States v. Wicks , 995 F.2d 964, 973 (10th Cir. 1993)).

It is difficult to imagine how the first federal business warrant could have been phrased more specifically. Cadre Supplies, Inc. is a firearms dealership which buys and sells virtually nothing but firearms, ammunition, parts, and accessories. A request to search for documentary evidence of fraudulent firearms transactions will by definition entail at least a viewing of a large portion of the documents generated by a firearms dealership. But this does not necessarily mean that the warrant is impermissibly broad. The difference between a valid warrant and an overbroad warrant lies in whether the government could have phrased the warrant more specifically, not in whether the business is small enough to sell only one type of commodity.

Here, Le was suspected of continuous violations of the federal firearms laws, not simply violations relating to a particular transaction or to a particular type of weapon. Officers could not, therefore, have taken the steps we required in Leary . 846 F.2d at 604-05 (requiring that a warrant be limited, if possible, to the specific transaction under suspicion and to specific companies under suspicion). Furthermore, the warrant, by authorizing a search for documents relating to firearms transactions, did provide a meaningful limitation. The warrant did not

-38-

authorize seizure of every financial document in the business, such as balance sheets and other accounting documents. Indeed, the executing officer testified at the suppression hearing that no financial documents were taken from the business. Tr. of Hearing on Motions, October 17, 1997, at 198. In any event, the mere fact that the business sells little other than firearms cannot operate to defeat the validity of the search warrant in this case. For instance, if the business were a general retailer which sold many different types of items, a warrant, premised on sufficient probable cause, authorizing a search for "any and all firearms transaction records" would likely be considered sufficiently limited and therefore not overbroad. A similar warrant will not be held invalid merely because the business which it authorizes agents to search is a smaller business confined to the purchase and sale of only one type of commodity. See United States v. Scherer, 523 F.2d 371, 376 (7th Cir. 1975) (sustaining a search warrant for a firearms dealership which authorized seizure of both the guns and the firearms records possessed by the business).

In the drug context, we have held that a generic warrant authorizing a search for all documents related to drug transactions may come within the Fourth Amendment's particularity requirement. See United States v. Wicks, 995 F.2d 964, 967, 973-74 (10th Cir. 1993) (warrant authorized a search for "currency . . . books, records, receipts, notes, ledgers, and other papers relating to the

-39-

transportation, ordering, sale and distribution of controlled substances"); United States v. Sullivan, 919 F.2d 1403, 1424 n.31 (10th Cir. 1990) (warrant authorized a search for "records, receipts, papers, instrumentalities, and documents related to an on-going suspected criminal enterprise in the trafficking of and conspiracy to distribute, controlled dangerous substances, including but not limited to, phone records and bills, utility bills and/or receipts, address books, records, photographs . . . , documents and receipts of travel, diaries, all monies, receipts, records and documents which show unusual, or suspect monetary transactions"); Harris, 903 F.2d at 774-75 (warrant authorized a search for "travel records and receipts . . . bank safe deposit records . . . currency . . . stocks, bonds, or other securities . . . gold silver and/or jewelry . . . books, records, memorandum, notes, bank records, investment records, or any other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or money obtained through illegal means"). Indeed, courts have noted that, in some instances, searching officers must be able to examine nearly every document possessed by a suspected criminal, if only to determine whether the documents contain evidence of criminal activity. One court stated that "a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category," and that "allowing some latitude in this regard simply recognizes the reality that few

-40-

people keep documents of their criminal transaction in a folder marked 'drug records.'" United States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990); see also Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976) (stating that "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized"); Kitty's East v. United States (In re The Matter of the Search of Kitty's East), 905 F.2d 1367, 1374-75, 1374 n.6 (10th Cir. 1990) (sustaining a warrant to search nearly every business record on the premises of an adult entertainment establishment, distinguishing Voss and Leary, and stating that "[e]vidence of conspiracy is often hidden in the day-to-day business transactions among the involved entities; therefore, it seems reasonable that the government would need to examine the documentation of these transactions to investigate a conspiracy").

These authorities amply demonstrate that the first federal business warrant, which authorized a search for documents relating to firearms transactions, was not unconstitutionally overbroad. The warrant gave executing officers as clear a notion as could have been expected under the circumstances what types of criminal activity were suspected, and which documents might contain evidence of those crimes. Le's argument to the contrary is without merit.

### 3. Scope of the Search

Next, Le argues that the federal agents who executed the first federal business warrant grossly exceeded the scope of that warrant by searching for items not named in the warrant. Le again argues that the proper remedy is a blanket suppression of all items seized pursuant to the first federal business warrant.

Pursuant to the first federal business warrant, agents seized "miscellaneous ATF records [and] log books," "phone message books," "miscellaneous correspondence, [and] firearms related documents." Appellant's App. at 63. Le argues that some of the firearms transaction documents seized by the agents contained no evidence of fraud, and therefore were not covered by the warrant and were improperly seized. Le further asserts that agents improperly seized documents, such as phone message logs, which have no apparent connection to firearms transactions. Also, Le argues that agents conducted an overbroad search for other items not named in the warrant, such as weapons and firearms, which were not actually seized on July 2.

Le's argument that too many firearms transaction documents were seized is foreclosed by United States v. Hargus, 128 F.3d 1358 (10th Cir. 1997), cert. denied, 118 S. Ct. 1526 (1998). In that case, officers suspected that the defendant was engaged in criminally fraudulent activities, and obtained a warrant to search

the defendant's business for ten specific types of records.  Officers found two file cabinets full of documents, and ascertained that each drawer contained some of the documents covered by the warrant.  Rather than undertake a lengthy on-site sorting procedure, officers simply seized both file cabinets in their entirety.  We upheld the seizure, stating that

> the officers' conduct did not grossly exceed the scope of the warrant. Their conduct was motivated by the impracticability of on-site sorting and the time constraints of conducting a daytime search warrant.  The officers were authorized to seize ten broad categories of records, and those records were present in every drawer of both file cabinets.  No item not specified in the warrant was admitted against [the defendant] at trial.  Under these circumstances the officers did not grossly exceed the warrant in concluding they did not need to examine at the site every single piece of paper in both cabinets.

Id. at 1363.

Similarly, officers in this case, suspecting fraudulent firearms transactions, were authorized to search for and seize all of Cadre Supplies, Inc.'s firearms transaction records.  Certainly, officers could not tell merely by looking at the face of a particular firearms document whether it involved a fraudulent transaction.  In such a case, officers were surely justified in taking all the firearms transaction documents, and examining them later to ascertain which ones evidenced fraud.  Their actions in seizing some documents which were later determined to be unrelated to fraudulent activity cannot be evidence of a flagrant disregard for the terms of the warrant.

-43-

Likewise, the agents' decisions to (1) call for an officer of the Department of Defense to determine if some of the weaponry seen in plain view was stolen, and (2) seize the phone message books are also not evidence of a flagrant disregard for the terms of the warrant. Even assuming, arguendo, that Le is correct in asserting that such decisions were beyond the scope of the warrant, a proposition that is by no means obvious, [8] the agents' actions did not constitute the type of flagrant disregard for the terms of the warrant which justified blanket suppression in Medlin, Foster, and Rettig. Le's only remedy for any excesses in

---

[8]For instance, there is a plausible argument that the military equipment could have been seized under the plain view doctrine. Agent Ward, the ATF agent who executed the first federal business warrant, testified that the weapons "appeared to be stolen to me . . . because of their brand new pristine boxed condition with military lot numbers on them." Tr. of Hearing on Motions, Oct. 17, 1997, at 214. This may have given him probable cause, under Arizona v. Hicks, 480 U.S. 321, 326-27 (1987), to believe that the weapons were stolen and to seize them under the plain view doctrine. Alternatively, there is an argument that the agents viewed the weapons, including their accompanying lot numbers, while searching for firearms transaction documents. Ward testified that there was "the possibility [that] there could have been [] ATF form[s]" in the weapons boxes because Le "had machine guns boxed up with paperwork." Tr. of Hearing on Motions, Oct. 17, 1997, at 216. In Hicks, the Supreme Court stated that "[m]erely inspecting those parts of the [item in question] that came into view during the [lawful] search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy issues." Hicks, 480 U.S. at 325.

We do not decide these issues here; we point out only that it is certainly not obvious that the agents' actions on July 2 were beyond the scope of the warrant, and that even if they were, they were not so grossly unlawful as to constitute flagrant disregard for the terms of the warrant.

the July 2 search of his business would be a remand to the district court to determine which items, if any, not mentioned in the warrant were searched and/or seized, and whether any of those items should be suppressed. Because Le was never prosecuted for the explosives seen at the business on July 2 and seized on August 4, or for any evidence found in the phone message logs, such a remand would be meaningless.

## II.    Forfeiture

Finally, Le argues that the district court erred by denying his motion for return of property, filed pursuant to Fed. R. Crim. P. 41(e). The district court denied this motion because Le expressly agreed to "forfeit and otherwise waive any ownership right he might possess in all items seized" during the execution of the various warrants. Appellant's App. at 112. Le now argues that the district court's decision was improper because Cadre Supplies, Inc. also has an ownership interest in some of the property, and, because the corporation was not party to the plea agreement, it has not waived its rights in the seized items.

Le's assertion may or may not be correct. In either case, it is beside the point. The party who filed the Rule 41(e) motion below, and who argues the issue here on appeal, is not Cadre Supplies, Inc. in its corporate capacity, but rather Thao Dinh Le in his personal capacity. The district court was entirely correct in

denying Le's motion because Le, the party who filed the motion contesting forfeiture, relinquished any ownership rights he may have had in the property. See United States v. Grover, 119 F.3d 850, 851-52 (10th Cir. 1997) (holding that a claimant who, in connection with a plea agreement, executed a "Forfeiture Agreement" in which he agreed to surrender the proceeds of his property to the government, had "relinquished any possessory claim he had to the property" and could not contest the forfeiture); see also United States v. Real Property Described in Deeds, 962 F. Supp. 734, 737 (W.D.N.C. 1997) (holding that a defendant who had waived his rights to the property as part of a plea agreement had no standing to contest the government's forfeiture of the property). Therefore, we are compelled to affirm the district court's decision with regard to the forfeiture of the seized property.

## CONCLUSION

For the foregoing reasons, Le's convictions are AFFIRMED.  We also AFFIRM the district court's decision denying Le's motion for return of seized property.