**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 5 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICHARD MASCARENAS,

Defendant - Appellant.

No. 01-1093

(D.C. No. 99-CR-208-N)

(D. Colorado)

**ORDER AND JUDGMENT** *

Before **LUCERO** , **ANDERSON** , and **BALDOCK** , Circuit Judges.

A jury convicted defendant Richard Mascarenas on two counts of drug

trafficking in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C.

§ 2. Mr. Mascarenas appeals his conviction on the following grounds: First, he

asserts that the district court should have granted his motions to suppress (i)

evidence obtained as a result of a court-authorized wiretap, (ii) evidence obtained

during the execution of search warrants at his residence and place of business,

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and (iii) incriminating statements he made during the search of his residence. Second, he asserts that the district court improperly admitted the out-of-court statements of an alleged co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Third, he asserts that there was insufficient evidence to support his conviction. [1] Exercising jurisdiction pursuant to 28 U.S.C. §1291, we affirm.

**FACTS**

Viewing the evidence in the light most favorable to the government and the jury verdict, the facts are as follows:

Law enforcement began investigating Mr. Mascarenas in February 1996, suspecting him of drug trafficking. In the spring and summer of 1996 the investigators obtained information from a number of confidential sources about Mr. Mascarenas' personal involvement in the drug trade. Some of these informants claimed to have purchased drugs directly from Mr. Mascarenas at his residence and/or places of business, including a bar known as Veronica's Bases Loaded ("Veronica's"). During this same period of time, investigators conducted "trash covers" [2] at Mr. Mascarenas' residence, discovering circumstantial evidence

---

[1] Mr. Mascarenas does not appeal any aspect of his sentence.

[2] "Trash covers" are a commonly used investigative technique whereby
(continued...)

of drug activity. By April 1997 investigators believed that Mr. Mascarenas was not a small time, independent drug dealer, but was part of a larger organization involving his sons, Anthony and Michael, as well as other family members and close friends. (For the remainder of this opinion we refer to the group of people involved in the drug trade with Mr. Mascarenas as the "Mascarenas Organization" or the "Organization").

Between April 28, 1997, and June 6, 1998, several confidential informants provided investigators with information about the Mascarenas Organization and/or purchased quantities of cocaine from members of the Organization. According to the investigators, however, none of these informants could provide information about the source(s) of the Organization's drug supply, or provide sufficient details about the structure of the Organization to allow for effective prosecution. Although investigators supplemented the information obtained from these confidential informants with a number of other investigative techniques (including, but not limited to, visual surveillance and the use of pen registers and trap and trace devices), these other techniques did not allow them to uncover the full scope of the suspected conspiracy, or the source of the Organization's drug supply.

---

[2](...continued)
officers collect the trash at a suspect's residence after it has been placed on the curb, and search through it for evidence of illegal activity.

As such, on or about August 6, 1998, Detective Marcus L. Fountain submitted an application and 49-page supporting affidavit requesting an order authorizing the wiretap of a cellular phone and pager known to be used by Anthony Mascarenas, Mr. Mascarenas' son. Judge Zita Weinshienk of the United States District Court for the District of Colorado approved the application and issued an order (98-WT-7-Z) authorizing the requested wiretap for thirty days. On or about September 10, 1998, Judge Weinshienk extended the wiretap for an additional thirty days.

On or about September 14, 1998, investigators were introduced to Jason Heath, a confidential informant who knew Mr. Mascarenas' other son, Michael, from time the two men spent together in jail. Mr. Heath expressed a willingness to help the investigators uncover information about the Mascarenas Organization. From September 14, 1998, until October 6, 1998, Mr. Heath cooperated by setting-up and completing five separate controlled drug purchases with Michael.

Of particular importance is Mr. Heath's fifth and final transaction, which occurred on October 6, 1998. Mr. Heath paged Michael from a police station and, in a return call, Michael agreed to provide him with four ounces of cocaine at Veronica's later that night. Mr. Heath was strip searched by the investigators to verify that he had no controlled substances already in his possession. He was

then given $3000 in federally marked bills and fitted with a body wire before he was dropped off at Veronica's by one of the investigators at about 7:00 p.m.

At approximately 8:15 p.m. investigators observed Mr. Mascarenas pull into the parking lot of Veronica's in a black Cadillac El Dorado. Michael and an unidentified woman exited the vehicle and proceeded into the bar where Michael met with Mr. Heath. Michael informed Mr. Heath that he did not have enough cocaine on him, suggesting that if Mr. Heath gave him the money he could go and get it. According to the testimony of Mr. Heath, when he hesitated and indicated he would not give Michael the money until he had the drugs in hand, Michael made a statement about giving the money to his dad. After Mr. Heath finally agreed and gave Michael the money, Michael then went outside, poked his head into the open passenger window of the El Dorado and spoke briefly with Mr. Mascarenas. Michael returned to the bar and Mr. Mascarenas drove away.

Investigators followed Mr. Mascarenas a couple of blocks to the area of 31st Avenue and Vallejo Street where Mr. Mascarenas parked the car and proceeded on foot down 31st Avenue. Although the investigators lost Mr. Mascarenas for a short period of time, the El Dorado eventually returned to Veronica's at approximately 10:00 p.m. At this point, Michael exited the bar and got into the car. Mr. Heath testified, however, that before Michael left the bar he

-5-

gave Mr. Heath a smaller quantity of drugs as a form of "collateral" to assure his return with the requested four ounces.

Shortly thereafter, the El Dorado arrived at the New U&H Chile Factory ("U&H Chile"), a business in which Mr. Mascarenas had a significant interest, serving as its President. A video surveillance camera set up by the investigators observed two men matching the description of Mr. Mascarenas and Michael exit the car and enter the factory. The two men remained inside U&H Chile for a short time, eventually returning to the vehicle and proceeding to Veronica's. Upon their arrival at Veronica's, Michael exited the car and went back inside the bar. Michael then completed the deal, providing Mr. Heath with approximately four ounces of cocaine.

On October 8, 1998, Detective Fountain filed an application for warrants to search numerous locations believed to contain evidence of the Organization's drug conspiracy, including, in relevant part, Mr. Mascarenas' residence at 13408 Marion Street and U&H Chile. In support of this application, Detective Fountain prepared a 74-page affidavit detailing the information obtained throughout the investigation, including information obtained as a result of the previously issued wiretap order and extension and information obtained as a result of the transaction between Mr. Heath and Michael two days before. Magistrate Judge Patricia A. Coan of the United States District Court for the District of Colorado

issued search warrants for both 13408 Marion Street and U&H Chile, among other locations.

A team of officers executed the search warrant at 13408 Marion Street at approximately 8:30 a.m. on Friday, October 9, 1998. Upon arriving at Mr. Mascarenas' residence, the officers knocked on the front door and announced their presence. After receiving no response they forced entry into the residence, whereupon they found Mr. Mascarenas standing in his underwear, about five feet from the main floor bedroom. He was holding a pair of pants and coming towards the officers with his wife proceeding about five feet behind him in her bathrobe. The police ordered both Mr. and Mrs. Mascarenas to the floor, where they remained for a very short period of time until the police could fully secure the residence. Mr. and Mrs. Mascarenas were then allowed to get up and sit on the living room couch. At this point, one of the officers searched the pants Mr. Mascarenas was holding, retrieving $4,661 in cash. Included in this cash were a number of federally marked bills matching those used by Mr. Heath to purchase cocaine from Michael on October 6. The officer then gave the pants back to Mr. Mascarenas.

While the other officer was searching Mr. Mascarenas' pants, Detective Joel Bell explained to Mr. Mascarenas the purpose of the entry and allowed him to review the search warrant. Detective Bell specifically informed Mr.

Mascarenas that the officers "were just there to search the residence," that "under normal circumstances, no one was going to go to jail that day," and that he "was free to leave, if he chose." Tr. of Trial Proceedings, November 27, 2000, at 108, Appellant's App. ("App."), Vol. II, at 453a. Finally, Detective Bell orally advised Mr. Mascarenas of his Miranda rights. Mr. Mascarenas then signed a form indicating that he understood and voluntarily waived those rights.

Mr. Mascarenas was then asked whether there were any narcotics in the house, to which he replied "no." Id. at 110, App., Vol. II, at 455. Shortly thereafter, one of the officers found a duffle bag containing approximately two kilograms of cocaine in the main floor bedroom, the bedroom Mr. and Mrs. Mascarenas were exiting when the police entered the home. When asked why he had lied to the officers about the presence of drugs in the home, Mr. Mascarenas replied "'Why would I tell you? I don't want to go to jail.'" Id. at 111, App., Vol. II, at 456.

After the search of the main floor bedroom was complete, Sergeant Ernie Martinez re-advised Mr. Mascarenas of his Miranda rights, specifically calling him to the kitchen counter to review the waiver form he had previously signed. Mr. Mascarenas was then asked if there were any more drugs or money in the house. He replied that there was about $80,000 upstairs and instructed Mrs. Mascarenas to show the officers where it was. Mrs. Mascarenas escorted two

police officers upstairs to what appeared to be a master bedroom used by Mr. Mascarenas and his wife. She then pointed out some cocaine in a jewelry box and retrieved a shoe box in the walk-in closet, handing it to one of the officers. Although the shoe box contained only $5500, the officers continued their search and eventually found $84,900 in cash hidden in a suitcase in the bedroom closet. Like the money found in Mr. Mascarenas' pants pocket, the cash found in the suitcase included a number of federally marked bills matching those used by Mr. Heath to purchase the cocaine from Michael on October 6. Finally, the officers found a brown bank bag containing $2,500 in cash, a black leather jacket containing $140 in cash, and a large water bottle containing $449 in cash.

After the officers finished searching the master bedroom, Mr. Mascarenas was called into the room, re-advised of his _Miranda_ rights a third time, and asked about the source of the drug supply and money they had found. At this time, Mr. Mascarenas would not identify the source of the money, but expressly indicated it did not come from any of his legitimate business ventures. He further claimed that "somebody" had brought the narcotics over a few days before, but did not identify who that "somebody" was. Tr. of Trial Proceedings, November 27, 2000, at 169, App., Vol. II, at 514. During the course of this final questioning, Mr. Mascarenas made a statement to the effect of "Maybe this is what I need for a wake-up call." Id. at 124, App., Vol. II, at 469. The officers then completed

their search and left the premises with the discovered evidence. They did not arrest Mr. Mascarenas at this time.

On the same day, and at approximately the same time as officers were executing the search warrant at 13408 Marion Street, different officers executed the search warrant at U&H Chile. This search uncovered a triple-beam scale, a trash can containing some clear cellophane wrapping, some clear plastic sandwich bags, and a kitchen steak knife. All of these items were found in a break room type area of the factory, adjacent to the main office. With the exception of the sandwich bags, each of these items contained cocaine residue. While the officers observed actual chili roasting equipment at the factory, the business did not appear to be actively processing or packaging chili.

On June 24, 1999, Mr. Mascarenas was indicted on two counts of drug trafficking. Specifically, Mr. Mascarenas was charged with knowingly and intentionally aiding and abetting in the distribution of cocaine on October 6, 1998, and knowingly and intentionally possessing, with intent to distribute, 500 grams or more of cocaine on October 9, 1998, both in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. §2. [3] Prior to trial, Mr. Mascarenas filed motions to suppress (i) evidence obtained as a result of wiretap 98-WT-7-Z

---

[3]Mr. Mascarenas' sons, Michael and Anthony, as well as others, were charged with conspiracy in Count One of the indictment. Mr. Mascarenas, however, was not included in this charge.

and its extension, (ii) evidence obtained during the search of his residence and U&H Chile, and (iii) all incriminating statements he made during the search of his residence. In a detailed Order and Memorandum of Decision, Judge Edward E. Nottingham of the United States District Court for the District of Colorado denied all of Mr. Mascarenas' motions.

The case proceeded to trial on November 27-29, 2000. At trial, the government offered tape recordings of the conversations between Michael Mascarenas and Mr. Heath during the October 6 transaction at Veronica's. These conversations had been captured by the body wire worn by Mr. Heath. Included in the tape recorded conversations was, among other things, Michael's statement to Mr. Heath that he would give the drug money to his dad. Mr. Mascarenas objected to the introduction of these statements on hearsay grounds. After conducting a hearing outside the presence of the jury, the district court overruled Mr. Mascarenas' objections, admitting the tape recordings as statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

On November 29, 2000, the jury convicted Mr. Mascarenas on both counts. He was thereafter sentenced to concurrent prison terms of 87 months on each count, and four years supervised release.

**DISCUSSION**

I.    Motions to Suppress

On an appeal from an order denying a defendant's motion to suppress, "this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party." United States v. Erving L. , 147 F.3d 1240, 1242 (10th Cir. 1998). See also United States v. Le , 173 F.3d 1258, 1264 (10th Cir. 1999); United States v. Castillo-Garcia , 117 F.3d 1179, 1186 (10th Cir. 1997). We address each of Mr. Mascarenas' motions to suppress in turn.

*A.    Wiretap Evidence*

Mr. Mascarenas appeals the district court's denial of his motion to suppress evidence obtained as a result of wiretap 98-WT-7-Z and its extension, contending that the wiretap was improperly authorized because the government failed to establish that it was "necessary" as required under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and our corresponding case law. [4] He asserts

---

[4]The statute itself requires all wiretap applications to include "a full and complete statement as to whether or not other investigative techniques have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and requires any issuing judge to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518 (1)(c)

(continued...)

that as a result of the government's failure to meet the necessity requirement, the

evidence obtained from the improperly authorized wiretap was improperly used to

support the government's subsequent search warrant applications, and improperly

admitted at trial. [5]  We disagree. [6]

---

    [4](...continued)
& (3)(c).  Our case law refers to these statutory provisions collectively as the
"necessity requirement," the purpose of which is "to ensure that the relatively
intrusive device of wiretapping 'is not resorted to in situations where traditional
investigative techniques would suffice to expose the crime.'"  United States v.
Edwards, 69 F.3d 419, 429 (10th Cir. 1995) (quoting United States v. Kahn, 415
U.S. 143, 153 n. 12 (1974)).

    [5]At trial, the government introduced excerpts from two tape recorded
conversations between Mr. Mascarenas and his son, Anthony.  Both of the
recorded conversations took place on October 8, 1998, and were recorded as part
of the extension to wiretap 98-WT-7-Z.  Neither the excerpts themselves nor their
transcripts were designated as part of the record on appeal, and thus we cannot
determine exactly what evidence was provided by these tapes.  It appears from the
government's closing statement, however, that the tapes were offered to prove
that Mr. Mascarenas dropped Michael off at Veronica's on October 6 and was
otherwise involved in the drug transaction between Michael and Mr. Heath that
evening.  See Tr. of Trial Proceedings, November 29, 2000, at 429, App., Vol. III,
at 774.  Regardless of what evidence was actually contained on these tapes, we
hold, for reasons more fully articulated below, that the district court did not err in
failing to suppress this evidence.  We also note that even if the admission of the
excerpts was erroneous, such error was harmless in light of the district court's
statement, in front of the jury, that "those two excerpts . . . proved nothing."  Id.,
November 28, 2000, at 87, App., Vol. II, at 433.

    [6]In the "Summary of the Argument" section of his opening brief, Mr.
Mascarenas suggests briefly that "the [wiretap] order authorizing approval under
which [his communications were] intercepted was insufficient on its face," and
that "the interceptions were made in contravention of Title 18, U.S.C. § 2510 et.
seq."  Appellant's Opening Br. at 9.  Although Mr. Mascarenas raised these
arguments below, he did not develop them on appeal, either in the body of his
(continued...)

Once a wiretap has been authorized by a district court, it is presumed proper and the defendant bears the burden of proving its invalidity under the statute.  United States v. Quintana  , 70 F.3d 1167, 1169 (10th Cir. 1995).  As such, Mr. Mascarenas bears the burden of proving that the government failed to meet

⁶(...continued)

brief or at oral argument.  Indeed, he did not even designate the wiretap orders themselves as part of the record on appeal, and thus we have nothing to review.  As such, we address only his necessity claim, and hold that any other claims were not properly raised and are therefore waived.  See United States v. Hardwell, 80 F.3d 1471, 1492 (issue waived when party fails "to make any argument or cite any authority to support his assertion").

Mr. Mascarenas also asserts that the district court incorrectly determined that he was not an "aggrieved person" and thus could not challenge the validity of the evidence obtained by wiretap 98-WT-7-Z.  As the government correctly points out, however, "[t]his argument confuses two different wiretaps." Appellee's Br. at 16.  In its Order and Memorandum of Decision denying Mr. Mascarenas' motions to suppress (as well as the motions to suppress of other co-defendants) the district court found that with regard to wiretap 98-WT-5-K, Anthony Mascarenas was the only "aggrieved person."  Order and Mem. of Decision at 27, Appellant's Opening Br. at Attachment 1.  However, because it was two of Mr. Mascarenas' co-defendants and not Mr. Mascarenas himself that challenged the validity of wiretap 98-WT-5-K, the district court's "aggrieved person" determination had no impact on Mr. Mascarenas or the outcome of his motion to suppress.  Id. at 26-27.

With regard to wiretap 98-WT-7-Z, the only wiretap actually challenged by Mr. Mascarenas below and actually before us on appeal, the district court did not find that Mr. Mascarenas (or any his co-defendants) were not "aggrieved persons."  To the contrary, the district court allowed Mr. Mascarenas (and his co-defendants) to challenge the validity of wiretap 98-WT-7-K, specifically ruling on the merits of such challenges and implicitly recognizing their "aggrieved" status.  See id., at 3-27.

-14-

the necessity requirement in this particular case. [7] We first articulated the standards the government must meet to satisfy the necessity requirement in Castillo-Garcia , stating as follows:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target[s] of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratal groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.

Castillo-Garcia , 117 F.3d at 1187. We also stated that "[w]hether other normal investigative techniques must also be explored before turning to wiretaps will depend on the unique circumstances of each investigation," id. at 1188, and that "a court must undertake a consideration of all the facts and circumstances in order

---

[7]We have previously acknowledged that there is an intra-circuit split regarding whether we should apply a *de novo* standard of review in necessity cases, or whether we should review simply for an abuse of discretion. See United States v. Mitchell, Nos. 00-1366, 00-1520, 00-1521, 2001 WL 1265813, at *3-4 (10th Cir. Oct. 23, 2001). In this case, we affirm regardless of which standard of review applies, and thus decline any invitation to resolve the circuit split at this time. See United States v. Garcia, 232 F.3d 1309, 1312 (10th Cir. 2000).

to determine whether the government's showing of necessity is sufficient to justify a wiretap." Id. at 1187 (quotation omitted). In any event, we recognize that "[t]he 'necessity' requirement . . . should be read in a common sense fashion . . . , and it is not necessary that every other possible means of investigation be exhausted." United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir. 1989).

Detective Fountain's 74-page affidavit adequately explained that the purpose of the investigation was to discover the full scope of the suspected drug conspiracy and uncover the ultimate source of the Organization's drug supply,[8] and, as discussed below, fully and completely explained why normal investigative techniques, including the five investigatory techniques expressly articulated in Castillo-Garcia, did not or would not have furthered this particular investigation.

### 1. Use of Undercover Police Officers to Infiltrate the Mascarenas Organization

It is clear from the affidavit that the investigators considered the use of undercover law-enforcement personnel and reasonably determined that the technique was unlikely to succeed. Detective Fountain explained that it "would not be possible, due to the fact that RICHARD MASCARENAS has historically

---

[8]See generally United States v. Newman, 733 F.2d 1395, 1399 (10th Cir. 1984) ("This court has held that the determination of the dimensions of an extensive drug conspiracy justifies the use of electronic surveillance.").

-16-

dealt only with family members and very close friends." Aff. of Marcus Fountain in Supp. of Appl. Auth. the Interception of Wire and Electronic Comm. ("Wiretap Aff.") ¶ 86, App., Vol. IV, at 939. He further noted that although "numerous law enforcement agencies" had been investigating the Mascarenas family for years, "no undercover officers have been able to actually make a drug purchase from any MASCARENAS family member." Id. Finally, he indicated that even if an officer could be introduced to one of the members of the Mascarenas Organization, "it would be an uncommon business practice at their level to disclose their source of supply." Id.

### 2. Use of Confidential Informants

The affidavit indicated that the investigators obtained information from a number of confidential informants, but reasonably concluded that they could not uncover the source of the drugs, the full scope of the criminal enterprise, or successfully prosecute members of the conspiracy using these informants because (i) none of them could actually identify the source of the drugs, (ii) most of them refused to testify, and (iii) a number of them had discontinued their cooperation during the course of the investigation. Id. ¶¶ 87-90, App., Vol. IV, at 939-40. He further explained that only a few of these confidential informants had actually been able to make drug purchases directly from those involved in the Mascarenas

-17-

Organization, and that none of them were actually introduced to the source of the drugs.  Id. ¶¶ 87-94, App., Vol. IV, at 939-41.

### 3.    Interviews of Co-conspirators and the use of a Grand Jury Investigation

The affidavit fully explained the difficulty of interviewing co-conspirators and other witnesses in this case, as well as the unlikely success of a Grand Jury investigation.   Detective Fountain explained that although the investigators considered interviewing co-conspirators and associates of the Mascarenas Organization, such interviews were never actually conducted because "the individuals who are knowledgeable of the criminal activities are generally participants of the crimes, and therefore, unwilling to provide information and testify."   Id. ¶ 95, App., Vol. IV, at 941.  He further explained that the investigators were hesitant to employ this method in this particular case out of fear that those interviewed would communicate such efforts "to the principals, their subordinates, or others, who would take even more precautionary measures to avoid further collection of evidence by law enforcement."        Id. ¶¶ 95-96, App., Vol. IV, at 941-42.

Detective Fountain further explained that although the investigators considered convening a Federal Grand Jury to investigate the illegal activities of the Mascarenas Organization, they believed that such an investigation would have

been unsuccessful given the fact that "many of the possible witnesses are co-conspirators themselves" who were likely to invoke their Fifth Amendment testimonial privilege or otherwise refuse to provide testimony, even under a grant of immunity.  Id. ¶¶ 97-98, App., Vol. IV, at 942-43.  His conclusions were entirely reasonable given his testimony that all of those apparently involved in the Mascarenas Organization appeared to be family members or close family friends, Id. ¶ 86, App., Vol. IV, at 939, and that all of those confidential sources previously discovered had been reluctant to testify, even under a grant of immunity, because they feared retaliation by the Mascarenas Organization. [9]

### 4. Search Warrants

The affidavit sufficiently demonstrated that the use of search warrants was not practical at that stage of the investigation.  Detective Fountain explained that "the execution of search warrants would not develop sufficient evidence

---

[9]See Wiretap Aff. ¶ 17, App., Vol. IV, at 911 ("A.U.S.A. Campbell also agreed to try to persuade those in charge to allow CS-1 and CS-1's family to leave the state in order to avoid possible retaliation from the Mascarenas organization."); id. ¶ 41, App., Vol. IV, at 918 ("CS-3 expressed the wish to remain anonymous and avoid testifying in any possible court proceedings.  CS-3 stated that testifying would endanger the life of CS-3 and/or the life of the CS-3's family."); id. ¶ 45, App., Vol. IV, at 920 ("CS-4 expressed a reluctance to testify due to the fact that CS-4 believes that it would endanger the life of CS-4 or CS-4's family"); id. ¶ 73, App., Vol. IV, at 928 ("CS-8 stated that CS-8 would never consider testifying against RICHARD MASCARENAS because CS-8 believes that RICHARD MASCARENAS would harm CS-8 or CS-8's family.")

necessary to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles." Id. ¶ 98, App., Vol. IV, at 942. He further explained that "no timely information ha[d] been provided by any confidential source that would provide enough probable cause to obtain search warrants for any location associated with" the criminal enterprise. Id., App., Vol. IV, at 942-43.

### 5. Visual and Aural Surveillance

The affidavit detailed the prior use of ordinary visual and aural surveillance in the investigation, and reasonably explained why it was unlikely to be a successful tool in this particular case. Specifically, Detective Fountain explained that (i) the previous use of the technique had provided only minimal information, (ii) the suspects were sophisticated in detecting and avoiding such surveillance, and (iii) the suspects employed the use of numerous vehicles and locations in conducting their operations, making it difficult to establish specific and meaningful surveillance. Id. ¶¶ 52-53 & 103-105, App., Vol. IV, at 921-22 & 943-44.

### 6. Pen Registers, Trap and Trace Devices and Other Techniques

Finally, the affidavit indicated that although the investigators utilized pen registers and trap and trace devices, trash covers, and the review of police records, such additional techniques could not provide sufficient information to uncover the full scope of the criminal enterprise or successfully prosecute those believed to be involved. With regard to pen registers and trap and trace devices, Detective Fountain testified that although these devices were "useful in revealing some of the associations and frequency of contact" among known participants of the conspiracy, they did not actually prove illegal activity or "identify the actual participants in the documented telephone calls." Id. ¶ 101, App., Vol. IV, at 943. Regarding trash covers, Detective Fountain explained that although they provided some useful information in the past, a confidential source had indicated that Mr. Mascarenas was "familiar with this investigative technique," rendering it of "no future value" to the investigation. Id. ¶¶ 99-100, App., Vol. IV, at 943. Finally, regarding the review of police records, Detective Fountain explained that although these records provide information on which suspects had been arrested for prior criminal activity, they "reveal nothing concerning the details or extent of the alleged on-going criminal activity." Id. ¶ 102, App., Vol. IV, at 943.

Based on the foregoing, we conclude that normal investigative techniques alone would not have allowed the investigators to uncover the desired

information, and affirm the district court's denial of Mr. Mascarenas' motion to suppress. [10]

---

[10]In so holding, we reject Mr. Mascarenas' argument that the affidavit inappropriately relied on "generic boilerplate language" that cannot be used to support a finding of necessity under the federal wiretap statute. Appellant's Opening Br. at 22. Although we recognize that "boilerplate" allegations and "generalities" alone "are insufficient to support a wiretap application," and that "statements must be factual in nature and . . . specifically relate to the individuals targeted by the wiretap," Castillo-Garcia, 117 F.3d at 1188, we also note that the government's burden "is not great," United States v. Bennett, 825 F. Supp. 1512,1525 (D. Colo. 1993), and that generalizations and "boilerplate" assertions can be made so long as they are accompanied by specific information about how these generalities apply to the particular suspects and/or the particular investigation. Although the affidavit contains some general observations about the problems Detective Fountain experienced using normal investigative techniques in similar drug conspiracy investigations, it does not rely entirely on these generalized statements. Rather, these statements are accompanied by specific information about the Mascarenas investigation. By way of example, the affidavit contained detailed information about the lengths particular suspects went to insulate themselves from infiltration by outsiders, as well as their sophistication in detecting and avoiding surveillance. It also explains how these factors enhanced the general problems investigators typically face while investigating criminal drug enterprises, and why the wiretap was therefore necessary in this particular case.

Finally, we reject Mr. Mascarenas' argument that the wiretap order was unnecessary because, in "hindsight," it was the discovery of Mr. Heath that actually provided the investigators with the evidence needed to finally prosecute Mr. Mascarenas. Appellant's Opening Br. at 23. In reviewing the necessity of a wiretap order, we consider only those facts and circumstances that existed at the time the order was issued, not facts and circumstances that come to light only after the wiretap has been authorized.

*B. Search Warrants*

As discussed above, pursuant to search warrants issued by Magistrate Judge Coan on or about October 8, 1998, police officers conducted simultaneous searches at Mr. Mascarenas' residence at 13408 Marion Street and at U&H Chile. The search of his home uncovered large quantities of cocaine and cash; the search of U&H Chile uncovered significant drug paraphernalia, particularly drug packaging materials. The district court denied Mr. Mascarenas' motion to suppress this evidence. Mr. Mascarenas argues that "Officer Fountain's affidavit in support of the search warrant[s] lack[ed] probable cause," and that the "District Court's findings [to the contrary] are clearly erroneous." Appellant's Opening Br. at 13.

In determining whether or not probable cause existed to support the issuance of a search warrant "we 'must consider the totality of the circumstances and determine whether the affidavit [in support of the warrant application] established the probability that evidence of criminal activity would be located in the desired search area.'" Le, 173 F.3d at 1265 (quoting United States v. Wittgenstein, 163 F.3d 1164, 1171 (10th Cir. 1998)). In undertaking this review, a magistrate judge's "determination that probable cause exists is entitled to 'great deference,' and 'we ask only whether the issuing magistrate [judge] had a "substantial basis" for determining probable cause existed.'" Id. (quoting

Wittgenstein, 163 F.3d at 1172) (further quotations omitted). The Supreme Court instructs us that close calls should be resolved in favor of the issuing magistrate judge. Massachusetts v. Upton, 466 U.S. 727, 734 (1984) (per curiam).

Contrary to Mr. Mascarenas' assertions, Detective Fountain's affidavit sufficiently demonstrated a strong probability that Mr. Mascarenas had a long history of drug trafficking and had historically and continually used his home and businesses to further his drug trafficking activities. The affidavit detailed information from several confidential sources about the drug trafficking activities of Mr. Mascarenas and others with close ties to him, including his sons. Aff. of Marcus Fountain in Supp. of an Application for a Search Warrant ("Warrant Aff.") ¶¶ 6-41, App., Vol. IV, at 957-969. At least four of these informants indicated that they had purchased large quantities of cocaine and methamphetamine directly from Mr. Mascarenas, both at his residence and at Veronica's. See id.[11]

---

[11]Specifically, the affidavit represents that (i) CS-1 purchased several kilograms of cocaine and methamphetamine from Mr. Mascarenas at his home and at the Log Cabin Bar (later renamed Veronica's) on several different occasions from 1993-1995, Warrant Aff. ¶¶ 7-16, App., Vol. IV, at 958-61, (ii) CS-2 purchased quarter ounces of cocaine from Mr. Mascarenas in 1997, mostly at Veronica's, but at least once at Mr. Mascarenas' home, id. ¶¶ 18-25, App., Vol. IV, at 962-64, (iii) CS-4 purchased ounce quantities of cocaine from Mr. Mascarenas at his home and Veronica's from December 1996 through September 1997, id. ¶¶ 31-33, App., Vol. IV, at 966-67, and (iv) CS-5 obtained methamphetamine from Mr. Mascarenas in February 1998. Id. ¶¶ 34-35, App.,

(continued...)

-24-

The affidavit also detailed a number of the cell phone conversations between Anthony Mascarenas and others intercepted as a result of wiretap 98-WT-7-Z and its extension. Id. ¶¶ 43-71, App., Vol. IV, at 971-1020. Detective Fountain opined that, based on his considerable experience investigating criminal drug enterprises, most of these conversations, including some with Mr. Mascarenas himself, were drug-related. Id. ¶ 73, App., Vol. IV, at 1023.[12] Likewise, the affidavit contained information about the drug trafficking activities of Michael and Mr. Mascarenas on October 6. Id. ¶ 72, App., Vol. IV, at 1020-22. This information specifically linked U&H Chile to Mr. Mascarenas' drug trafficking activities.

Finally, the affidavit contained information indicating that Michael Mascarenas had engaged in drug trafficking activity in the weeks immediately preceding the search, and that this activity was directly linked to Mr. Mascarenas' home, as well as U&H Chile. The affidavit detailed a number of instances in which Michael set-up drug transactions from Mr. Mascarenas' home. Id. ¶¶ 59,

_____

[11](...continued)
Vol. IV, at 967. Additionally, the affidavit explains that another informant, CS-6, had an acquaintance who opened a small restaurant inside Veronica's and who admitted to CS-6 in March 1998 that he was buying kilograms of cocaine from Mr. Mascarenas every three to four days. Id. ¶¶ 37-39, App., Vol. IV, at 968-69.

[12]Insofar as Mr. Mascarenas asserts that the search warrants were invalid because they relied, at least in part, on communications illegally obtained as a result of wiretap 98-WT-7-Z and/or its extension, we have already upheld the legality of the wiretap, see supra Section (A)(1), rendering the argument moot.

61 & 66-67, App., Vol. IV, at 992-97, 999-1003 & 1009-16.  It also detailed at least two occasions where Michael contacted or attempted to contact persons at U&H Chile during the course of completing these drug transactions.      <u>Id.</u>  ¶¶ 59 & 67, App., Vol. IV, at 992-97 & 1011-16.

Despite the considerable amount of information in the affidavit establishing probable cause, Mr. Mascarenas asserts that we should completely ignore the information obtained from confidential informants about his drug activity because "many of the instances discussed . . . occurred several years ago," and that the information was therefore "stale."  Appellant's Opening Br. at 15.  In      <u>United States v. Shomo</u>, 786 F.2d 981 (10th Cir. 1986), we stated as follows:

> [P]robable cause to search cannot be based on stale information that no longer suggests that the item sought will be found at the place to be searched. . . .  <u>While it is true that the timeliness of the information contained in the affidavit is an important variable, probable cause is not determined simply by counting the number of days between the facts relied on and the issuance of the warrant. . . . Rather, whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized. . . .</u>

<u>Id.</u> at 984 (emphasis added).  Here, although the affidavit contained information about Mr. Mascarenas' past activity that might not, by itself, support a finding of probable cause, it also contained more than enough information demonstrating that Mr. Mascarenas and his sons were engaged in ongoing and continuous drug activity.  <u>See</u> <u>e.g.</u> <u>Le</u>, 173 F.3d at 1267 (holding that the "passage of time is not of

critical importance" where there is evidence in the affidavit that the offense is ongoing). Thus, the affidavit did not rely on "stale" information to establish probable cause.

Finally, Mr. Mascarenas asserts that because any evidence of recent drug activity at 13408 Marion Street involved Michael, and not himself, there was no probable cause to search his home. We are unpersuaded. The probable cause analysis properly focuses not on individual suspects or tenants of the place to be searched, but on the likelihood that evidence will be found at the subject location. All that is required is a showing that someone engaged in illegal activity, had access to the area to be searched, and that evidence of the illegal activity was likely to be found in the location. The affidavit sufficiently demonstrates that, at the very least, Michael was engaged in the drug trade and had unfettered access to the home. It further established that Mr. Mascarenas had himself used his residence to further drug dealing activities in the past, and that he likely remained an active participant in the criminal drug trade. See United States v. Reyes, 798 F.2d 380, 382 (10th Cir. 1986) ("It is reasonable to assume that certain types of evidence would be kept at a defendant's residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence.") As such, there was more than enough information to allow

Magistrate Judge Coan to reasonably infer that evidence of illegal drug trafficking would be found at the Mascarenas residence at 13408 Marion.

In sum, we hold that the affidavit contained sufficient information to support Magistrate Judge Coan's determination that there was probable cause to issue the warrants. [13] Accordingly, we affirm the district court's denial of Mr. Mascarenas' motion to suppress, and the admission of evidence obtained from the searches against Mr. Mascarenas at trial.

### C.    *Incriminating Statements*

Mr. Mascarenas next challenges the district court's denial of his motion to suppress the incriminating statements he made during the search of his residence. He asserts that these statements were improperly obtained while he was in custody, and before he was properly mirandized, in violation of his Fifth

---

[13]Even if we assume, *arguendo*, that the affidavit failed to establish probable cause for the search warrants, we would nonetheless affirm the district court and hold that the Fourth Amendment exclusionary rule is inapplicable in this case because the officers conducted the searches in "good faith" under United States v. Leon, 468 U.S. 897 (1984). The district court concluded that "none of the four enumerated situations exist which would preclude the application of the good-faith exception to the exclusionary rule." Order & Mem. of Decision at 45, Appellee's Br. at Attachment 1. Having reviewed the entire record *de novo*, see United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999), we completely agree.

Amendment rights. [14] The district court found, however, that Mr. Mascarenas was given the required Miranda warnings not once, not twice, but three times, and that Mr. Mascarenas made his incriminating statements only after he was properly mirandized and voluntarily waived his rights. See Order & Mem. of Decision at 35, Appellee's Br. at Attachment 1. Having thoroughly reviewed the entire record in this case, [15] we conclude that the testimony below cannot support Mr. Mascarenas' claim on appeal, and affirm the district court's findings. [16] As such,

---

[14]Mr. Mascarenas further asserts that the incriminating statements were obtained as a "'direct exploitation[] of the primary illegality of the initial search'" of his residence, and that they therefore should have been suppressed as the "fruit[] of the poisonous tree." Appellant's Opening Br. at 17 (quoting Wong Sun v. United States, 371 U.S. 471 (1963)). We have already determined that the search of Mr. Mascarenas' home was legal. See supra Section (A)(2). As such, his incriminating statements need not be suppressed on this ground.

[15]In reviewing a district court's denial of a motion to suppress incriminating statements under Miranda we review findings of "historical fact" for clear error, but review legal issues de novo. United States v. Erving L., 147 F.3d 1240, 1244-1246 (10th Cir. 1998).

[16]In his reply brief, Mr. Mascarenas admits that at least some of his incriminating statements "were made after Miranda warnings were provided," but asserts that "initial statements made by Mr. Mascarenas including but not limited to his comment of a 'wake-up call' [were] made before Miranda warnings were provided." Appellants' Reply Br. at 7. This assertion blatantly mischaracterizes the record. At trial, Detective Joel Bell testified that Mr. Mascarenas made the "wake-up call" statement "in the bedroom" after he had been given Miranda warnings for the third time. Tr. of Trial Proceedings, November 28, 2000, at 122, 124, App., Vol. II, at 467, 469. This testimony was corroborated by the testimony of Sergeant Ernie Martinez, id. at 168-69, App., Vol. II, at 513-14, and we find nothing in the record to support Mr. Mascarenas' contrary assertions on appeal.

we need not decide whether or not he was "in custody" at the time of the questioning.

II.     Hearsay

Mr. Mascarenas contends that the district court erroneously admitted certain hearsay statements made by Michael Mascarenas during the October 6 drug transaction with Mr. Heath as statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence. "We review the district court's decision to admit statements of a co-conspirator for abuse of discretion," United States v. Eads, 191 F.3d 1206, 1210 (10th Cir. 1999), reviewing its factual findings for clear error. United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996).

Under rule 801(d)(2)(E), co-conspirator statements are not considered hearsay and are thus properly admitted if the district court finds, by a preponderance of the evidence, that (i) "a conspiracy existed," (ii) "both the declarant and the defendant against whom the declaration is offered were members of the conspiracy," and (iii) the statement "was made in the course of and in furtherance of the conspiracy." Eads, 191 F.3d at 1210 (internal quotation omitted). Prior to the admission of the disputed evidence, the district court held a hearing, outside the presence of the jury, and found that there was sufficient

-30-

evidence of a conspiracy between Mr. Mascarenas and his son, Michael, and that the statements Michael made to Mr. Heath on October 6 were made in furtherance of this conspiracy. Having reviewed the entire record, we hold that the district court's factual findings in this regard were not clearly erroneous, and that it did not abuse its discretion in admitting Michael's statements under Rule 801(d)(2)(E). [17]

[17]Mr. Mascarenas' primary argument on appeal is that the district court's findings were clearly erroneous because "if the Government had sufficient proof of Mr. Mascarenas' conspiratorial conduct with Michael Mascarenas, he would have been charged in the conspiracy count." Appellant's Reply Br. at 8. This argument lacks merit. Although the prosecution's failure to charge Mr. Mascarenas with conspiracy was inexplicable, it has no impact on the hearsay analysis. As Mr. Mascarenas himself acknowledges, see id., we have routinely held that a defendant need not be charged with a conspiracy to have co-conspirator statements admitted against him under Rule 801(d)(2)(E). See, e.g., United States v. Kaatz, 705 F.2d 1237, 1244 (10th Cir. 1983). Regardless of the charge, there was more than enough evidence of a conspiracy involving Mr. Mascarenas and his sons to allow the admission of Michael's statements under Rule 801(d)(2)(E).

Mr. Mascarenas also asserts that the admission of these statements violated his Sixth Amendment right to confront witnesses against him, by denying him "access to conduct cross-examination on Michael Mascarenas." Appellant's Opening Br. at 26. Because we hold that the evidence in this case meets the requirements for admission under Rule 801(d)(2)(E), it also satisfies the requirements of the Confrontation Clause. See United States v. Molina, 75 F.3d 600, 603 (10th Cir. 1996) (recognizing that "the requirements for admission of evidence under Federal Rule of Evidence 801(d)(2)(E) are identical to the requirements of the Confrontation Clause, so if the evidence meets the requirements of Rule 801(d)(2)(E), the evidence is constitutionally admissible").

III.    Sufficiency of the Evidence

Mr. Mascarenas' final contention is that the evidence at trial was insufficient to sustain the jury verdict rendered against him. "In considering a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the government to determine whether the evidence is such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Dirden, 38 F.3d 1131, 1142 (10th Cir. 1131). "We consider both direct and circumstantial evidence," as well as reasonable inferences drawn therefrom, "accept[ing] the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." Id.

Mr. Mascarenas' first count of conviction was for aiding and abetting in the distribution of cocaine, based on his involvement with the October 6 drug transaction between Michael and Mr. Heath. In challenging his conviction on this count, Mr. Mascarenas does not dispute that there was in fact a drug transaction between Michael and Mr. Heath, but simply asserts that there was insufficient evidence of his own involvement to prove that he aided and abetted his son in completing the deal, asserting that he was an innocent bystander in the transaction. We are not persuaded.

"To be guilty of aiding and abetting, a defendant must willfully associate with the criminal venture and aid such venture through affirmative action."

United States v. Jones, 44 F.3d 860, 869 (10th Cir. 1995).  The evidence introduced at trial was sufficient to support the jury's conclusion that Mr. Mascarenas was actively involved in the transaction.  Among other things, the evidence demonstrated that (i) Mr. Mascarenas transported Michael to Veronica's and later to U&H Chile, (ii) U&H Chile was used, at least in part, for the packaging of cocaine, (iii) Michael did not have enough cocaine to give Mr. Heath before he went to U&H Chile with his father, and (iv) Michael delivered the cocaine to Mr. Heath just minutes after he and his father left U&H Chile. Finally, the evidence demonstrated that Michael gave the purchase money to his father, and that the federally marked bills used by Mr. Heath to purchase the cocaine were found in Mr. Mascarenas' possession just three days later.

Mr. Mascarenas' second count of conviction was for possession of cocaine with intent to distribute, based on the large amounts of cocaine and money found in his residence during the October 9 search.  Mr. Mascarenas asserts that there is insufficient evidence of possession because "his home was frequented by many people including his sons Anthony and Michael Mascarenas," and that "[t]his type of exposure creates doubt as to who in the home actually possessed the cocaine

that was discovered." [18]  Appellant's Opening Br. at 32.  Again, however, we are not persuaded.

The evidence was sufficient to support the jury's conclusions that Mr. Mascarenas knowingly possessed cocaine found at his residence.  His own statements during the search demonstrate that he was fully aware of the presence of drugs in his home.  Moreover, the evidence demonstrated that the drugs were not found in the common areas of the home, or areas of the home used by people other than Mr. Mascarenas himself, but in two bedrooms where Mr. Mascarenas and his wife lived and slept on a regular basis.  Although there was certainly evidence supporting Mr. Mascarenas' claim that others, particularly his sons, had unfettered access to the home, the existence of such evidence does not render the jury verdict erroneous.   See United States v. Edmonson , 962 F.2d 1535, 1547-48 (10th Cir. 1992) ("[T]he evidence may be sufficient even though it does not exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion of guilt [.]  A jury is free to choose among reasonable

_____

[18]Mr. Mascarenas further asserts that because his conviction on this count rested almost entirely on evidence obtained as a result of the October 9 search of his residence, it must "be vacated" if "this Court agrees with Mr. Mascarenas' assertion that the search warrant was invalid."  Appellant's Opening Br. at 32. We have already determined that the search of Mr. Mascarenas' home was legal, and the that the evidence obtained therefrom was properly admitted against Mr. Mascarenas.  See supra Section (A)(2).  As such, his conviction need not be vacated on this ground.

constructions of evidence.") (internal quotations omitted).  The jury apparently discredited this evidence, or gave it less weight, and we will not second guess the jury's decisions in this regard.

## CONCLUSION

We hold that the district court properly denied Mr. Mascarenas' motions to suppress (i) evidence obtained as a result of wiretap 98-WT-7-Z and its extension, (ii) evidence obtained as a result of the search of Mr. Mascarenas' residence and U&H Chile, and (iii) incriminating statements Mr. Mascarenas made during the search of his residence.  We further hold that the district court properly admitted hearsay statements of Michael Mascarenas as statements of a co-conspirator under Rule 801(d)(2)(E), and that there was sufficient evidence to sustain both counts of Mr. Mascarenas' conviction.  Accordingly, the conviction on both counts is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge