**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SALVADOR FAVELA-FAVELA

    Defendant - Appellant.

No. 00-6421

(D.C. No. 00-CR-38-W)

(W. D. Oklahoma)

---

**ORDER AND JUDGMENT** [*]

---

Before **EBEL**, **MCWILLIAMS**, and **HENRY**, Circuit Judges.

---

Salvador Favela-Favela was convicted after a jury trial of two counts of transporting illegal aliens in the United States, violations of 8 U.S.C. § 1324(a)(1)(A)(ii). On appeal, Mr. Favela advances the following arguments: (1) that the district court erred in denying his motion to suppress evidence obtained during a February 16, 2000 traffic stop; (2) that the evidence was insufficient to support his convictions; (3) that the government violated Brady v. Maryland, 373

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

U.S. 83 (1963), by failing to timely disclose evidence that would have allowed impeachment of a government witness; (4) that the government violated his due process and Sixth Amendment rights by allowing the deportation of material witnesses prior to trial; (5) that the district court issued several erroneous evidentiary rulings; and (6) that the district court's cumulative errors warrant reversal. We are not persuaded by Mr. Favela's arguments and therefore affirm his convictions. [1]

## I. BACKGROUND

At approximately 9:50 a.m. on February 16, 2000, Clinton, Oklahoma police officer Michael Nabors observed a Ford van traveling northbound on a road near Interstate-40. At the suppression hearing, Officer Nabors testified that he could see that there were two people in the front seat of the van and that the driver was an Hispanic male. Officer Nabors also noticed that there was a female passenger who was sitting in between the front two seats in the van and was not wearing a seatbelt. Officer Nabors explained that this passenger seemed to be sitting on her knees. He therefore concluded that she was not wearing a seatbelt

---

[1] We also grant the following motions: the government's motion to supplement the record (with the transcripts of the video depositions of Messrs. Cabanzo-Sanchez and Castillo-Estrada); (2) the appellant's motion to supplement the record with exhibits.

and was thus violating Oklahoma law.[2]

Officer Nabors stopped the van. As he stood near the driver's door, he noticed that there were about twenty people inside. According to Officer Nabors, the people in the van "really didn't look at me, they looked straightforward as if to not make eye contact, just kind of stared straight forward." Rec. vol. II, at 12 (Tr. of Motions Hr'g, July 5, 2000).[3]

Officer Nabors asked the driver for his license and insurance verification. The driver produced a Texas license, which identified him as the defendant Salvador Favela-Favela. Mr. Favela then stepped out of the van, and Officer Nabors began to question him.

At the suppression hearing, Officer Nabors described the sequence of questions as follows. First, he asked Mr. Favela if he was on a trip, and Mr Favela responded affirmatively. Then, the officer asked if the van's passengers were family members or if they were on a church function. To both those questions, Mr. Favela said. "No." Then, he asked Mr. Favela "if everybody in the van was 'legal.'" Id. at 11. Mr. Favela responded, "No," but he added that the

---

[2] Oklahoma law provides that, with certain exceptions, "Every operator and front seat passenger of a passenger car operated in this state shall wear a properly adjusted and fastened safety seat belt system, required to be installed in the motor vehicle when manufactured." Okla Stat. tit. 47, § 12-417(A).

[3] Officer Nabors further explained, "[U]sually you stop a vehicle and people want to stare at you, find out what's going on. These people didn't seem to do that." Rec. vol. II, at 12.

passengers were "good people" who "weren't causing anybody any problems" and "were just trying to . . . find work." Id. at 13. Mr. Favela asked Officer Nabors to give him a break and let the passengers go.

Officer Nabors replied that he needed to keep asking questions. He inquired whether the passengers were paying Mr. Favela. Mr. Favela responded that each passenger had paid him approximately $180.00.

At that point, Officer Nabors asked Mr. Favela to return to the van and wait. Officer Nabors then called his supervisor, Sergeant Gene Kelly. At the suppression hearing, Sergeant Kelly testified that, upon arriving at the scene, he too questioned Mr. Favela. He said that in response to his question as to whether the passengers were "legal," Mr. Favela again responded negatively.

The officers took Mr. Favela and the passengers to the Clinton police station and contacted the Immigration and Naturalization Service (INS). Mr. Favela volunteered the following information to Sergeant Kelly: that he had made twenty other trips from Arizona to Georgia and Florida, that they were going to the latter two states because the fruit crop and construction business were doing well, that this was the first time he had been stopped, and that another person told him where to pick up his passengers.

INS Agents Rodney McDonald and Eugene Graham arrived at the police station shortly thereafter. They told Mr. Favela that he was under arrest and read

him the <u>Miranda</u> warnings in Spanish.  The INS agents also presented Mr. Favela with two "<u>Lujan-Castro</u>" waiver forms, one in English and one in Spanish.  <u>See United States v. Lujan-Castro</u>, 602 F.2d 877 (9th Cir. 1979).  Mr. Favela signed the waiver form that was written in Spanish.[4]

After Mr. Favela signed the <u>Lujan-Castro</u> waiver, eighteen out of the twenty passengers were returned to their country of origin.  As to the other two—Manual Cabanzo-Sanchez and Jorge Alberto Castillo-Estrada, the government took video depositions.

Prior to trial, Mr. Favela filed a motion to suppress the evidence obtained by the government following Officer Nabors' stop of the van.  He presented the following arguments: (1) that Officer Nabors lacked probable cause to stop van initially; (2) that Officer Nabors' questions were unduly intrusive;  (3) that the questioning conducted by Sergeant Kelly at the Clinton police station before <u>Miranda</u> warnings were given violated Mr. Favela's Fifth Amendment rights; (4)

---

[4]  The <u>Lujan-Castro</u> form advised Mr. Favela that: (1) he had the right to require temporary detention of illegal aliens who might serve as witnesses; (2) if he did not require the witnesses to stay, they would be returned to their country of origin and could not later be returned for trial; (3) if the witnesses remained in the United States at his request, they would do so under the supervision of the United States and at the cost of the United States; (4) these witnesses could  be called to testify for him or for the government; (5) he had the right to have a lawyer assist him in making the decision to retain or release witnesses and that, if he could not afford a lawyer, one would be appointed for him; and (6) he and his lawyer had the right to speak to the witnesses before his trial.

that the testimony of Mr. Cabanzo-Sanchez and Mr. Castillo-Estrada (the two passengers who were not deported) should not be admitted at trial because the government permitted them to avoid permanent detention in exchange for their trial testimony; and (5) that the deportation of the eighteen other passengers violated his constitutional rights.

The district court rejected the first, second, fourth, and fifth arguments. It concluded that there was probable cause for the initial stop, that the scope of Officer Nabors' questions was reasonable, that Mr. Cabanzo-Sanchez and Mr. Castillo-Estrada could testify at trial because "[n]o evidence was presented that the will of either [man] was overborne or that their statements were the product of impermissible government acts or threats," and that Mr. Favela had signed the Lujan-Castro form waiving his right to present testimony from the eighteen other passengers. See Rec. vol. I, doc. 77, at 15-16 (District Court Order, filed July 12, 2000).

However, the court also concluded that Sergeant Kelly had questioned Mr. Favela about ownership of the van before Miranda warnings were issued and that, at the time of this questioning, Mr. Favela was in custody and under interrogation. Thus, "[a]ny statements made by [Mr.] Favela to Sergeant Kelly at the police station were obtained in violation of Miranda and [Mr.] Favela's Fifth Amendment right against self-incrimination and will therefore be suppressed."

-6-

Id. at 14-15.

At trial, the government presented video depositions from Mr. Cabanzo-Sanchez and Mr. Castillo-Estrada. Mr. Sanchez testified that he crossed the border from Mexico without permission of the United States government, that he walked from the border to Phoenix, and that friends made arrangements for his transportation with Mr. Favela. Mr. Estrada gave similar testimony.

Agent McDonald provided testimony about unlawful entry into the United States. He testified that the area at which Mr. Sanchez crossed the border was a common staging area for illegal immigrants. He added that Mr. Favela had a phone book with a phone number for Altar Sonora, Mexico. According to Agent McDonald, this location is also a staging area for Mexican aliens to cross into the United States.

Mr. Favela's defense was that he had a legitimate transportation company and that he did not know of the illegal status of his passengers. He offered testimony from the Assistant Manager of the Union Bus Station in Oklahoma City that Greyhound did not have a policy of checking into the immigration status of passengers.

Mr. Favela also sought to minimize the import of his statements to Officer Nabors and Sergeant Kelly. He offered testimony from a social worker and family friend that his knowledge of English was limited.

Finally, Mr. Favela offered expert testimony from a former police officer, Theodore Montgomery. Mr. Montgomery testified that, if a person was sitting between the front seats of the van, Officer Nabors could not have seen that person.

## II. DISCUSSION

### A. Denial of Motion to Suppress

In reviewing the denial of a motion to suppress, we examine the district court's factual findings for clear error. United States v. Le, 173 F.3d 1258, 1264 (10th Cir.1999). We view the record in the light most favorable to the government. Id. The ultimate question of whether the government's conduct was reasonable under the Fourth Amendment is a legal question that we consider de novo. Id.

In this appeal, Mr. Favela challenges both the initial traffic stop and the questioning by Officer Nabors leading up to Mr. Favela's statement that the occupants of the van were not "legal." We examine each argument separately.

### 1. Initial Stop

Under the Fourth Amendment, a traffic stop constitutes a seizure and therefore must be "reasonable." Delaware v. Prouse, 440 U.S. 648, 653 (1979).

A stop is reasonable if it is based on an observed traffic violation or a reasonable articulable suspicion that such a violation has occurred or is occurring. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc). Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. United States v. Cortez, 449 U.S. 411, 417-418 (1981); see also United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) ("While either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary.").

Mr. Favela first argues that "[n]o reasonable officer could have observed a seatbelt violation under the scenario suggested by [Officer] Nabors." Aplt's Br. at 27. He maintains that the record establishes that the traffic stop was made because of Mr. Favela's Hispanic heritage rather than because of Officer Nabor's observations of a seatbelt violation. In support of this argument, Mr. Favela lists various inconsistencies between Officer Nabors's statements at the preliminary hearing, the motion to suppress hearing, and the trial. He points to differences in the officer's account of the order in which he asked questions and in whether the questions were asked when Mr. Favela was still in the van or when he stepped out of it. Mr. Favela also notes that Sergeant Kelly admitted on cross-examination that "the nationality of the people sitting in front of the van" was "a predominant factor in [his] decision to ask whether or not they were legal." Aplt's Br. at 21

(citing Rec. vol II, at 104).

We are not convinced by Mr. Favela's challenge to the initial stop. Here, the district court made the factual finding that Officer Nabors observed an unrestrained passenger in the front seat area of the van. None of the evidence noted by Mr. Favela establishes that this finding was clearly erroneous. In light of this factual finding, the accompanying legal conclusion is justified: Officer Nabors had "a particularized and objective basis," see Cortez, 449 U.S. at 417-418, for suspecting a violation of the Oklahoma seatbelt law.[5]

Like the district court, we are not convinced that statements by Officer Nabors and Sergeant Kelly that they noticed the ethnic appearance of Mr. Favela and the passengers rendered the traffic stop unreasonable under the Fourth Amendment. The fact that both officers noticed the ethnic appearance of Mr. Favela and his passengers does not establish that it was that appearance—rather than the reasonable suspicion of a traffic violation—that led to the initial stop. Moreover, "[w]hen determining whether an officer possessed a reasonable articulable suspicion, the subjective motivations of an arresting officer are

---

[5] At oral argument, the parties noted that there was some dispute as to the proper legal interpretation of the Oklahoma seatbelt law, as applied to facts at issue here (i.e., a passenger in the middle of the front seat). However, Mr. Favela's counsel explained that, in this appeal, he is not challenging Officer Nabors's interpretation of the statute. Instead, counsel stated, Mr. Favela's argument is that the record does not support the district court's finding that Officer Nabors actually saw a woman kneeling in the front seat of the van.

irrelevant." Callarman, 273 F.3d at 1286 (citing Botero-Ospina, 71 F.3d at 787); see also Whren v. United States, 517 U.S. 806, 813 (1996) (adopting an objective approach). Thus, even if the officers' statements were some evidence of a bias against Hispanics (an inference the record does not support), the fact that Officer Nabors had a reasonable basis to suspect a violation of the Oklahoma seatbelt law establishes that the stop of the van was reasonable under the Fourth Amendment.

## 2. Continuing Detention

Mr. Favela further argues that, once Officer Nabors made the initial stop, he had no legitimate basis for the questioning about the identity of the passengers or their immigration status. Again, he maintains that Officer Nabors's motivation was race-based, and that the continuing detention therefore violated the Fourth Amendment. We analyze this argument under the framework set forth in Terry v. Ohio, 392 U.S. 1, 20 (1968), asking whether Officer Nabor's continuing detention of Mr Favela "was reasonably related in scope to the circumstances which justified the interference in the first place." see Botero-Ospina, 71 F.3d at 786.

Under the Fourth Amendment, a police officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, and issue a citation. United States v. Hunnicutt, 135 F.3d at 1345, 1349 (10th Cir. 1998). He or she may also ask about "travel plans . . . and the ownership of the

car." United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989).  However, after the officer has issued the citation and the driver has produced a valid license and proof that he is entitled to operate the car, the officer must allow him to proceed on his way without further delay.  United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc).  In two circumstances, the officer may engage in additional questioning:  (1) if he or she "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring;" and (2) if the subject of the additional interrogation consents to it.  United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994) (citation omitted).

In assessing what constitutes an objectively reasonable suspicion of illegal activity, we defer to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  See United States v. McCrae, 81 F.3d 1528, 1534 (10th Cir. 1996) (internal quotation marks omitted).  We assess the officer's conduct in the light of common sense and ordinary human experience, considering the totality of the circumstances.  United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994).

This traffic stop jurisprudence does not support Mr. Favela's argument.  Officer Nabor's initial questions to Mr. Favela concerned his travel plans (i.e. "if [Mr. Favela was on a trip, . . . if [the passengers] were all his family[,] . . . [and] if it was a church function [or] church group").  See Rec. vol. II, at 11.  As part

of the initial inquiry during a legitimate traffic stop, these questions were not unduly intrusive. See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) ("[Q]uestions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop") (internal quotation marks omitted).

The next question asked by Officer Nabors—whether the passengers were "legal"—cannot be so easily characterized as a routine question about travel plans. However, at the time that he asked that question, Officer Nabors had several grounds for suspecting illegal activity.

First, Mr. Favela's negative answers to the questions about whether the passengers were family members or a church group eliminated two lawful activities that could explain the presence of such a large number of people in the van. Second, Officer Nabors testified that he had learned of several instances in which vans or other large vehicles had been stopped and officers had discovered illegal aliens being transported across the country. See Rec. vol II, at 6. Some of these stops had been made by the Clinton, Oklahoma Police Department.

Based on the totality of the circumstances confronting him, we conclude that Officer Nabors's question about the immigration status of the passengers was justified by his observations. See United States v. Santana-Garcia, 264 F.3d 1188, 1193 (10th Cir. 2001) (holding that motorists' negative response to the

-13-

question "whether they were 'legal'" established probable cause to arrest them "for suspected violation of federal immigration law") ; United States v. Salinas-Calderon, 728 F.2d 1298, 1301 n.3 (10th Cir. 1984) (stating that "[a] state trooper has general investigatory authority to inquire into possible immigration violations"). We therefore conclude that Officer Nabors's questioning and the continuing detention of Mr. Favela did not violate the Fourth Amendment.

## B. Sufficiency of the Evidence

Mr. Favela argues that the evidence is insufficient to support his convictions. This is a question of law that we examine de novo. United States v. Magleby, 241 F.3d 1306, 1311 (10th Cir. 2001). We must determine "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999). We will disturb the jury's verdict only if our review leads us to conclude that no reasonable jury could have found beyond a reasonable doubt that the defendant was guilty of the crimes charged. Id.

Mr. Favela was charged with and convicted of violating 8 U.S.C. § 1324(a)(1)(A)(ii), which makes it illegal for "[a]ny person who . . . knowing or in

-14-

reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." In order to establish a violation of § 1324(a)(1)(A)(ii), the government must prove: (1) that the defendant transported or moved an alien within the United States, (2) that the alien was present in violation of law, (3) that the defendant was aware of the alien's status, and (4) that the defendant acted willfully in furtherance of the alien's violation of the law. See United States v. Barajas-Chavez, 162 F.3d 1285, 1289 (10th Cir. 1999) (en banc).

Here, Mr. Favela concedes that the government established the first two elements. See Aplt's Br. at 38. However, he argues that the government did not prove beyond a reasonable doubt that he knew of the passengers' illegal status or that he acted willfully.

In support of this contention, he first argues that his answer to the question whether the passengers were "legal" was ambiguous. According to Mr. Favela, he could have been referring to the passengers not wearing seatbelts or to there being too many people in the van. Similarly, he maintains that his reference to the passengers being "good people" was evidence that he believed that they were in the country legally. Aplt's Br. at 37. In general, he asserts that, in light of his

limited understanding of English, little weight should be given to his responses to the Clinton police officers' questions.

Mr. Favela also points to evidence supporting an inference of a good faith belief that the passengers were legally in the country. He observes that he picked up his passengers far north of the border, that he had no previous contact with them, that many people were traveling lawfully during this time in order to obtain work, and that it was customary for people to travel in groups. Mr. Favela also points to several factors that support the inference that he ran a legitimate transportation business: the van was not constructed to hide passengers, he traveled during the day, he obtained a liability policy providing extensive coverage in case of an accident, and the van was registered properly.

We are not convinced by Mr. Favela's arguments. The facts to which he directs us establish only that the evidence is conflicting as to his state of knowledge. As the government observes, there are also facts that controvert Mr. Favela's interpretation. For example, the alien witnesses testified that, only a few days after their arrival in the United States, Mr. Favela picked them up, along with the other passengers, at a unfurnished two-to-three room trailer in Phoeniz, Arizona, some 1,231 miles away from Huntsville, Texas (where Mr. Favela usually resided). Additionally, Mr. Favela's van contained a subscriber agreement for a cellular telephone, which listed a false address in Florida as Mr.

Favela's home address.  A jury could reasonably view these facts as supporting the government's contention that Mr. Favela knew that he was transporting illegal aliens.

More importantly, Mr. Favela gave incriminating answers to the Clinton police officers' questions about the passengers, admitting that they were not "legal" and asking the officers to give the "good people" a break.  Although these answers are arguably ambiguous, any such ambiguities merely presented factual questions for the jury to resolve.  United States v. Horn, 946 F.2d 738, 743 (10th Cir. 1991) (noting that a rational jury could interpret ambiguous testimony in favor of the government).

Because we must view the record in the light most favorable to the government, see Hanzlicek, 187 F.3d at 1239, we conclude that the evidence is sufficient to support Mr. Favela's convictions.

### C.  Brady Claim

Mr. Favela argues that the INS withheld material, exculpatory evidence in violation of Brady v. Maryland , 373 U.S. 83 (1963)  .  The evidence in question is a false resident alien card and a false social security card possessed by Mr. Estrada, one of the passengers whose video deposition was taken and played at trial.  Mr. Favela states that he did not learn of these false documents until the

July 5, 2000 suppression hearing, well after Mr. Estrada had been returned to Mexico and was no longer available.

According to Mr. Favela, this evidence was material because it would have shown that he lacked knowledge that the passengers were illegal aliens (i.e., if they appeared to have legitimate documents, then Mr. Favela could not have committed the charged offenses knowingly and willingly). Mr. Favela also asserts that he could have used the evidence to impeach Mr. Estrada (by suggesting that, because he had false documents, he may have testified falsely about other matters).

In order to establish a Brady violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material. United States v. Quintanilla, 193 F.3d at 1139, 1149 (10th Cir. 1999); see also Brady, 373 U.S. at 87. Evidence is material under Brady if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

Here, the evidence in question (the false identification documents) was introduced at trial—through INS Special Agent Stephen Merrill. Thus, the only difference in what would have happened if the INS had timely disclosed these documents before Mr. Estrada's video deposition is that Mr. Favela's counsel

-18-

could have confronted the witness with them directly, rather than indirectly, by challenging Mr. Favela's credibility in closing argument.  See Aples' Br at 44-45 (noting that Mr. Favela's lawyer mentioned in his closing argument that none of the passengers "had . . . papers").

Mr. Favela has failed to demonstrate a reasonable probability that this difference in the means of impeachment would have affected the result of the trial.  Thus, the withheld evidence lacks materiality and his Brady argument is without merit.


### D. Deportation of Potential Witnesses

Mr. Favela argues that the immediate deportation of eighteen out of the twenty passengers violated his due process and Sixth Amendment rights by depriving him of material evidence and by failing to provide him with an attorney before he waived the right to delay deportation.

Mr. Favela's argument is undermined by the language of the waiver form that he signed.    See Rec. vol. I, doc. 77, at 6-7 n.11 (District Court Order, filed July 12, 2000).  That form, presented to Mr. Favela in Spanish and signed by him, states that Mr. Favela waives his right to delay the witnesses' deportation and also informs him that he has a right to a government appointed lawyer to advise him on the decision:    See id.  (noting that the form stated, "You have the right to have

-19-

a lawyer assist you at this time in making this decision to retain or release these witnesses; if you cannot afford a lawyer, the United States government will provide you one at no cost to you.").

Mr. Favela argues in conclusory fashion that the waiver is invalid.    See Aplt's Br. at 44.  His conclusory statements are not sufficient to overcome the waiver.  See Lujan-Castro, 602 F.2d at 878 (affirming the district court's finding that a similar waiver was knowingly and voluntarily executed and stating that "[t]he district court's conclusion that the waiver was knowingly and intelligently executed is a finding of fact that may not be disturbed unless clearly erroneous"). Moreover, Mr. Favela has failed to establish that any of the eighteen passengers who were deported could have provided exculpatory evidence.

We therefore conclude that the deportation of the eighteen witnesses did not violate Mr. Favela's right to counsel or his due process rights.


### E. Evidentiary Rulings

Mr. Favela sets forth a list of alleged evidentiary errors:  (a) allowing the government to use "buzzwords" like "smuggler," "safehouse," and "staging area," see Aplt's Br.at 47; (b) allowing testimony from INS agent McDonald as to a widespread smuggling problem; (c) allowing the jury to be informed of the grand jury indictment; (d) using a financial affidavit, in which Mr. Favela stated that he

was indigent, to impeach his statements about having a legitimate business; (e) refusing to allow him to use a videotape that concerned the relative speed of the vehicles at the time of the traffic stop.

We review a district court's rulings on evidentiary matters for abuse of discretion. United States v. Weller, 238 F.3d 1215, 1220 (10th Cir. 2001). "In order to reverse a district court judgment on account of an evidentiary ruling, [an appellant] must make a clear showing [he] suffered prejudice, and the ruling was inconsistent with substantial justice or affected h[is] substantial rights." Coletti v. Cudd Pressure Control, 165 F.3d 767, 773 (10th Cir. 1999) (internal quotation marks omitted).

Upon review of the record, we discern no grounds for reversal. As the government notes, many of Mr. Favela's arguments are conclusory and provide no citations to the record and no explication of the legal authority supporting the claims of error. In any event, Mr. Favela has not established that any of these rulings was "inconsistent with substantial justice or affected h[is] substantial rights." Id. (internal quotation marks omitted).[6]

---

[6] We do view one evidentiary issue with some concern: the government's introduction of a financial affidavit (signed by Mr. Favela in order to have counsel appointed for him). The government introduced this affidavit in order to rebut Mr. Favela's contention that he ran a legitimate business. The district court ruled that the affidavit was part of the court record and could be used for impeachment. See Rec. vol. VI, at 807.

(continued...)

## F. Cumulative Error

Finally, Mr. Favela argues that the cumulative errors of the government and the trial judge warrant a new trial. "[C]umulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir.1990). Because Mr. Favela has not shown any individual errors, he cannot prevail on his claim of cumulative error.

---

[6](...continued)

In United States v. Hardwell, 80 F.3d 1471, 1483 (10th Cir. 1996), this court held that the government violated the defendant's Fifth Amendment right against self incrimination by offering, as part of its case in chief, statements made the defendant to establish eligibility for appointed counsel.

In this case, the government attempts to distinguish Hardwell by arguing that it used the affidavit only to impeach witnesses who testified that Mr. Favela had a legitimate transportation business. For several reasons, we need not decide in this case whether the government's attempt to distinguish Hardwell is persuasive.

First, Hardwell involves a Fifth Amendment right. In his opening brief, Mr. Favela argues that the admission of the financial affidavit was an evidentiary error, but he does not raise a Fifth Amendment claim. Thus, we need not consider the argument that the admission of the affidavit violated his Fifth Amendment rights. See United States v. Murray, 82 F.3d 361, 363 n. 3 (10th Cir. 1996) (declining to consider arguments raised for the first time in a reply brief).

Moreover, any Fifth Amendment violation arising out of the introduction of the financial affidavit is still subject to review for harmless error. See Hardwell, 80 F.3d at 1483 (noting that the financial affidavit had little relevance to one of the charges and therefore affirming that conviction). Here, the government presented other evidence to rebut Mr. Favela's contention that he ran a legitimate business. Thus, the admission of the affidavit was harmless.

## III.  CONCLUSION

For the reasons set forth above, we AFFIRM Mr. Favela's convictions and sentences.

Entered for the Court,


Robert H. Henry
Circuit Judge